Volume 1 of 2

## FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: PHENYLPROPANOLAMINE (PPA)
PRODUCTS LIABILITY LITIGATION,*

SHANTELL ALLEN, on behalf of
Allen, Vera, et al.,*
　　　　　　*Plaintiffs-Appellants,*

v.

BAYER CORPORATION, et al.,
　　　　　　*Defendants-Appellees.*

No. 04-35370

D.C. No.
MD-01-01407-BJR*

LEON ANDERSON, JR., et al.,*
　　　　　　*Plaintiffs-Appellants,*

v.

BAYER CORPORATION, et al.,
　　　　　　*Defendants-Appellees.*

No. 04-35562

D.C. No.
MD-01-01407-BJR*

*A complete list of the appellants and appellees with district court case numbers is set forth in a separate, unpublished order filed contemporaneously with this opinion. Certain appellants on that list were dismissed in this court's orders filed on January 14, 2005, and February 21, 2006. The names of some of the dismissed appellants who were lead plaintiffs in multi-plaintiff cases have been retained on the caption for reference purposes only.

10293

Leslie Ackel, et al.,*
        *Plaintiffs-Appellants,*

        v.

Bayer Corporation, et al.,
        *Defendants-Appellees.*

No. 04-35588
D.C. No.
MD-01-01407-BJR*

Bridgett Arrington, et al.,*
        *Plaintiffs-Appellants,*

        v.

Bayer Corporation, et al.,
        *Defendants-Appellees.*

No. 04-35611
D.C. No.
MD-01-01407-BJR*

Calvin McGriggs, et al.,*
        *Plaintiffs-Appellants,*

        v.

Delaco Company, et al.,
        *Defendants-Appellees.*

No. 04-35614
D.C. No.
CV-03-03428-BJR*

Betty Clinton, et al.,*
        *Plaintiffs-Appellants,*

        v.

Delaco Company, et al.,
        *Defendants-Appellees.*

No. 04-35621
D.C. No.
MD-01-01407-BJR*

DONNA SASSEEN,
*Plaintiff-Appellant,*

v.

IDE INTERSTATE INC., et al.,
*Defendants-Appellees.*

No. 04-35884
D.C. No.
CV-03-03279-BJR

ELIZABETH PAGE,
*Plaintiff-Appellant,*

v.

BAYER CORPORATION,
*Defendant-Appellee.*

No. 04-36137
D.C. No.
CV-03-01343-BJR

MARIE RILEY,
*Plaintiff-Appellant,*

v.

WYETH, obo itself and its
unincorporated division, Wyeth
Consumer Healthcare, fka
Whitehall-Robins Healthcare
formerly known as American
Home Products Corporation, et al.,
*Defendants-Appellees.*

No. 05-35105
D.C. No.
CV-03-02073-BJR

KEVA K. ALFORD, on behalf of all
wrongful death beneficiaries of
Henry Dexter, et al.,*
*Plaintiffs-Appellants,*

and

EDDIE BULLOCK, et al.,
*Plaintiffs,*

v.

WYETH, obo itself and its
unincorporated division, Wyeth
Consumer Healthcare, fka
Whitehall-Robins Healthcare
formerly known as American
Home Products Corporation, et al.,
*Defendants-Appellees,*

and

NOVARTIS PHARMACEUTICALS
CORPORATION, et al.,
*Defendants.*

No. 05-35121

D.C. No.
CV-04-00399-BJR*

BOBBY HOLMES, et al.,
*Plaintiffs-Appellants,*

v.

BAYER CORPORATION,
*Defendant-Appellee.*

No. 05-35129

D.C. No.
CV-01-02061-BJR

Melody McDaniel,
*Plaintiff-Appellant,*

v.

Wal-Mart Stores, Inc., et al.,
*Defendants-Appellees.*

No. 05-35147

D.C. No.
CV-03-03226-BJR

Samantha Samuels, et al.,
*Plaintiffs-Appellants,*

v.

Bayer Corporation,
*Defendant-Appellee.*

No. 05-35184

D.C. No.
CV-01-02059-BJR

OPINION

Appeals from the United States District Court
for the Western District of Washington
Barbara Jacobs Rothstein, District Judge, Presiding

Argued and Submitted
February 7 and 8, 2006**—Seattle, Washington

**Eighteen appeals, several consolidated, were randomly assigned to two panels, one consisting of Judges D. Nelson, Rymer, and Fisher, the other of Judges Leavy, Rymer, and Fisher. The Nelson/Rymer/Fisher panel heard argument on February 7, 2006 in *Hill v. Bayer*, No. 05-35219, and *Anderson v. Bayer*, No. 04-35875. The panel unanimously found *Womack v. SmithKline Beecham*, No. 04-35933, *Page v. Bayer*, No. 04-36137, *Ackel v. Bayer*, No. 04-35588, *Arrington v. Bayer*, No. 04-35611, *McGriggs v. Delaco*, No. 04-35614, *Riley v. Wyeth*, No. 05-35105, *Holmes v. Bayer*, No. 05-35129, *McDaniel v. Wal-Mart Stores*, No. 05-35147, and *Samuels v. Bayer*, No. 05-35184, suitable for decision without oral argument. Disposition of these cases has priority over cases heard by the Leavy/Rymer/Fisher panel on February 8, 2006 in *Burrage v. Bayer*, No. 03-35953, *Allen v. Bayer*, No. 04-25370, *Leon Anderson v. Bayer*, No. 04-35562, and *Lorrilla Hill v. Bayer*, No. 04-85518. This panel unanimously found *Clinton v. Delaco*, No. 04-35621, *Sasseen v. IDE Interstate*,

Filed August 29, 2006

Before: Dorothy W. Nelson, Pamela Ann Rymer and
Raymond C. Fisher, Circuit Judges; and Edward Leavy,
Pamela Ann Rymer and Raymond C. Fisher, Circuit Judges.[1]

Opinion by Judge Rymer;
Partial Concurrence and Partial Dissent by Judge Rymer

---

No. 04-35884, and *Alford v. Bayer*, No. 05-35121, suitable for decision without oral argument.

This opinion resolves all appeals except *Womack v. SmithKline Beecham*, No. 04-35933, *Hill v. Bayer*, No. 05-35219, *Anderson v. Bayer*, No. 04-35875, *Burrage v. Bayer*, No. 03-35953, and *Lorilla Hill v. Bayer*, No. 04-35518, for which separate unpublished dispositions have been filed.

[1]All judges participated in deciding, and sign the opinion with respect to, Parts I, II and III which are common to all appeals. Judges Nelson and Leavy participated in deciding — and sign an opinion only with respect to — those appeals assigned to the panel of which they were respectively a member. For convenience, we note panel composition for discrete appeals Part by Part.

## COUNSEL

Damon A. Kirin, Murray Law Firm, New Orleans, Louisiana, for plaintiffs-appellants Allen, Anderson, Clinton, Riley, Holmes and Samuels; Michael J. Miller, Miller & Associates, Alexandria, Virginia, for plaintiff-appellant Hill.

Randolph S. Sherman (argued), Kaye Scholer, LLP, New York, New York, and D. Joseph Hurson (signed the briefs), Lane Powell Spears Lubersky LLP, Seattle, Washington, for the defendants-appellees.

Stephen B. Murray, Sr., Murray Law Firm, New Orleans, Louisiana, for plaintiffs-appellants Ackel, Arrington, and McGriggs.

Terry O. Tottenham, Fulbright & Jaworski LLP, Austin, Texas, and Douglas A. Hofmann, Williams, Kastner & Gibbs, PLLC, Seattle, Washington, for the defendants-appellees.

Leila H. Watson, Cory Watson Crowder & DeGaris, P.C., Birmingham, Alabama, for plaintiff-appellant Sasseen.

D. Joseph Hurson, Lane Powell Spears Lubersky LLP, Seattle, Washington, for the defendants-appellees.

David B. Vermont, Herman, Mathis, Casey, Kitchens & Gerel, LLP, Alexandria, Virginia, for plaintiff-appellant Page.

W. Thomas McCraney, III, McCraney & Montagnet, PLLC, Jackson, Mississippi, for plaintiffs-appellants McDaniel and Alford.

Frank A. Wood, Jr., Watkins & Eager PLLC, Jackson, Mississippi, for defendant-appellee Bayer Corporation.

Alan J. Lazarus, Drinker Biddle & Reath LLP, San Francisco, California, for all defendants-appellees SmithKline Beecham Corporation (dba Glaxosmithkline) and GlaxoSmithKline Consumer Healthcare, L.P.

---

## OPINION

RYMER, Circuit Judge:

These appeals are from judgments of dismissal entered in a multidistrict litigation (MDL) proceeding for failure to comply with case management orders. The orders were entered with the agreement of all sides that they were necessary to move hundreds of cases and thousands of plaintiffs toward resolution on the merits. The district court found that many plaintiffs inexcusably failed to do what was required, and dismissed their actions. Some appeal. We must decide whether these dismissals were a clear error of judgment.

The principles that guide a court's discretion to dismiss are well settled, but we have never addressed how they play out in the context of multidistrict litigation. We conclude that while the rules are the same as for ordinary litigation on an ordinary docket — that is, a court determining whether to dismiss an action on account of a plaintiff's noncompliance with a court order must weigh the public's interest in expeditious

resolution of litigation; the court's need to manage its docket; the risk of prejudice to the defendants; the public policy favoring the disposition of cases on their merits; and the availability of less drastic sanctions — multidistrict litigation is different because of the large number of cases that must be coordinated, its greater complexity, and the court's statutory charge to promote the just and efficient conduct of the actions. 28 U.S.C. § 1407. As a result, the considerations that inform the exercise of discretion in multidistrict litigation may be somewhat different, and may tip the balance somewhat differently, from ordinary litigation on an ordinary docket.

Recognizing this, we cannot say that the district court abused its discretion in dismissing the cases before us, except for *McGriggs* and *Sasseen*, as to which we reverse.[2]

I

Phenylopropanolamine (PPA) was used in many decongestants and weight-control products until the Food and Drug Administration (FDA) issued a public health advisory on November 6, 2000 warning that this ingredient potentially increased the risk of hemorrhagic stroke. *See* U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Research, Pub. Health Advisory Subject: Safety of Phenylpropanolamine, Nov. 6, 2000, http://www.fda.gov/cder/drug/infopage/ppa/advisory.htm (last visited Feb. 26, 2006). The advisory stated that the FDA was taking steps to remove PPA from drug products and to request drug companies to discontinue marketing products containing PPA. *Id.*; *see also* U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Research, Phenylpropanolamine (PPA) Information Page, http://www.fda.gov/cder/drug/infopage/ppa/default.htm (last visited Feb. 26, 2006).

---

[2]The disposition as to *McGriggs* is authored by Judge Fisher, joined by Judge D. Nelson.

As a result, lawsuits were filed in state and federal courts throughout the country against pharmaceutical companies by persons claiming injury for ingestion of a product containing PPA. On motion of plaintiffs in one such action in the Eastern District of Louisiana, the Judicial Panel on Multidistrict Litigation found that fourteen actions then pending in several district courts were rooted in complex core questions concerning the safety of PPA and that centralization was necessary to eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel, and the judiciary. *See In re Phenylpropanolamine (PPA) Prods. Liab. Litig. No. 1407*, 173 F. Supp. 2d 1377, 1379 (J.P.M.L. 2001). Accordingly, on August 28, 2001, the Panel designated the Western District of Washington as the appropriate forum for MDL 1407, and ordered the PPA actions to be transferred and assigned to Hon. Barbara Jacobs Rothstein for pretrial consolidation and coordination.[3] *Id.* at 1380.

MDL 1407 got under way with an initial status conference on November 16, 2001. It addressed the leadership structure for counsel, and issues relating to discovery, experts, use of technology, class actions, and federal-state coordination. The court appointed Lead and Liaison Counsel for plaintiffs and defendants on November 21 and a Plaintiffs' Steering Committee on January 17, 2002. As part of its duties, the Plaintiffs' Steering Committee was to assist all plaintiffs in MDL 1407 by overseeing discovery, communicating with plaintiffs' lawyers, making court appearances, attending status conferences, and preparing motions and responses regarding case-wide discovery matters.

At the court's direction, the parties submitted an agreed-

---

[3]More than 3300 actions were eventually listed on the docket in MDL 1407. *See* Judicial Panel on Multidistrict Litigation, Distrib. of Pending MDL Dockets (as of Jan. 10, 2006), http://www.jpml.uscourts.gov/ Pending_MDLs/PendingMDL-January-06.pdf; http://www.jpml.uscourts. gov/Pending_MDLs/pending_mdls.html.

upon Case Management Order (CMO) 1, which set out basic procedures and a master framework for discovery. Among other things, this order, filed January 29, 2002, states that "[a] party's failure to either produce a relevant document or identify same as withheld pursuant to a privilege may be viewed by the Court as an infraction of its orders, justifying appropriate sanctions." CMO 1 at ¶ VIII. It also provides that notice by the court to Plaintiffs' Liaison Counsel and Defendants' Liaison Counsel of any matter or ruling relating to all actions would be considered as notice to all MDL 1407 parties, and that service on Liaison Counsel would constitute service on all plaintiffs' and all defendants' counsel, respectively. *Id.* at ¶ III C, D.

A series of eighteen case management orders followed. They were applicable MDL-wide to all PPA actions transferred to MDL 1407, and governed both MDL-wide and case-specific issues. Case Management Orders were posted on the court's public website for the PPA litigation (http://www.wawd.uscourts.gov/mdl). The primary orders at issue in these appeals are CMOs 6, 10, and 19, which control pretrial management of discovery, and CMOs 13 and 15, which concern product identification.

Case Management Order 6, filed March 18, 2002, set forth the basic principles for taking fact discovery of plaintiffs. No objections were lodged to the order in its final form. It requires all case-specific discovery to occur during the time periods permitted in the order, and adopts a "Plaintiff's Fact Sheet" (PFS) protocol in lieu of interrogatories to streamline the process. The PFS is a questionnaire to be signed under oath seeking information about the plaintiffs' injuries, medical history, current medical condition, identification of the product claimed to have caused injury, specifics of the injury suffered, and the identity of the plaintiffs' healthcare providers. It also includes blank authorizations to be signed by plaintiffs to allow defendants to collect medical and other records. (CMO 6A replaced several authorizations in CMO 6

that did not comply with federal statutory provisions, but made no other changes.) CMO 6 set a case-specific cut-off date of February 28, 2003 for all cases docketed in the MDL by February 12, 2002, and for cases docketed after February 28, 2003, case-specific discovery was to be completed within 12 months of the docket date. Plaintiffs in every case currently docketed were ordered to complete a Plaintiff's Fact Sheet no later than 45 days after a blank PFS was transmitted by defendants, and plaintiffs in all cases transferred to MDL 1407 thereafter were to complete a PFS within 45 days after service. The PFS was the starting point for defendants' assessment of plaintiffs' claims and the precondition for proceeding with further discovery, including depositions; defendants could not take case-specific fact depositions sooner than 120 days after the plaintiff served a completed Fact Sheet. CMO 6 provided that Defendants' Liaison Counsel was to send a warning letter to any plaintiff who failed to serve a Fact Sheet within the time allowed; if the plaintiff still failed to furnish complete responses within 30 days of the warning letter, defendants could seek appropriate relief if a meet and confer did not resolve the issues.

There were approximately 439 cases in the MDL when CMO 6 was entered; eight months later, there were more than 1,500 plaintiffs in 736 cases either in, or pending transfer to, MDL 1407. The court found that despite the efforts of the Defendants' and the Plaintiffs' Steering Committees, many plaintiffs had failed to comply with CMO 6's requirement to complete a Plaintiff's Fact Sheet. Therefore, the court entered CMO 10 on November 22, 2002 "to provide for the timely completion of discovery." CMO 10 provides that the one-year period for completion of discovery would not begin to run until a substantially complete PFS and accompanying authorizations were provided to defendants, and that no case would be considered for remand until the plaintiff had complied with the discovery requirements set forth in the court's prior orders, the court had determined that the discovery obligations of the plaintiff had been completed, and defendants had

sufficient time to complete case-specific discovery. It also states that "[n]othing in this Order shall prevent defendants from seeking additional remedies or sanctions against any plaintiff for failure to comply with the discovery obligations set out in prior CMOs, on a case-by-case basis."

CMO 19 was entered on June 23, 2004. The court noted that it had issued CMO 10 after learning that plaintiffs had not complied with the requirements of CMO 6, and found that despite the requirements of CMOs 6 and 10, changes were necessary to provide for the timely completion of case-specific discovery in the MDL cases. CMO 19 ordered plaintiffs to complete a Plaintiff's Fact Sheet in all respects and serve it within 45 days after transmission of the blank PFS. For cases where no PFS was returned, Defendants' Liaison Counsel were to send a letter warning that the case was subject to dismissal, after which the plaintiff would have an additional 15 days to comply. If a PFS were received on time but was not completed in all respects, a deficiency letter was to be sent allowing an additional 15 days to serve a completed PFS and warning that the case was subject to dismissal if one were not received.

Meanwhile, the court addressed two different product identification problems in CMOs 13 and 15. The first set of cases involved individuals who claimed to have ingested one or more PPA-containing products. CMO 13, entered on May 2, 2003, requires each plaintiff in a multi-defendant case to file and serve within 30 days an Affirmation setting forth the PPA product he or she allegedly ingested and the manufacturer of that product. It authorizes defendants to submit a proposed order of dismissal with prejudice of the claims of any plaintiffs who failed to identify them in the PFS or in their Affirmation, and to seek additional sanctions with regard to discovery and PFS obligations.

The other set of cases involved unrelated claims of numerous plaintiffs who were joined without specifying which prod-

ucts they allegedly ingested or the manufacturers of the products that allegedly caused their injuries. By way of example, the court noted that there were 29 pending cases out of Louisiana that attempted to join over 1000 plaintiffs, with one case alone (not on appeal) accounting for over 500 PPA plaintiffs. Therefore, it entered CMO 15 on May 29, 2003, directing each plaintiff in a multi-plaintiff case to file and serve an individual, new complaint within 30 days to provide specific allegations regarding the products allegedly ingested, the dates on which the products were ingested, the injury alleged, and the dates of injury. CMO 15A, issued August 26, 2003, supplemented CMO 15 by providing for dismissal with prejudice of all jointly-filed complaints, including those plaintiffs for whom a timely filed individual severed complaint was not filed, as of the effective date of the order (October 26, 2003).

The court held a status conference on July 31, 2003 to address the problem of noncompliance with both the discovery and the product-identification CMOs. Liaison Counsel, members of the Plaintiffs' Steering Committee and Discovery Steering Committee, and Lead Counsel appeared. During this session, Judge Rothstein stated from the bench:

> I right now will tell you that any case that has not complied with my discovery order will be dismissed. Now, that sounds simple, because there are some cases you can tell right off the bat there are no fact sheets, no medical records; they will be dismissed.

> But then you get into the more complicated cases that I think [counsel] was about to address, but I'm going to go into it myself. And that is cases that have not complied with my order to break down multi-plaintiff cases into single plaintiff cases with a specific complaint that sets out the facts for the case.

> Now, when hundreds of cases are filed with exactly the same complaint, I would say, by defini-

tion, you're in violation of the order. And if a motion is brought, I will dismiss those cases.

Now, if there's an answer that for some reason, justifiable reason really and truly all of those plaintiffs were exactly the same and had the same injury from the same product against the same defendant on the same day, if you can convince me that that's the case, I will certainly not dismiss the case.

But the time has come to figure out which of these cases are real and which of them aren't. And if discovery hasn't been complied with, there's a strong presumption on my part that the case should be dismissed . . . .

A minute entry documenting the July 31, 2003 status conference and indicating that "[t]he court instructed the Defendants to diligently pursue filing motions to dismiss for failure to comply with CMO 6, 13, and 15" was posted on the district court's electronic docketing system, PACER/CM-ECF, on August 7, 2003 as "Document 1922," and a few months later on the court's public MDL website. *See* W.D. Wa. PPA Litig. Website, http://www.wawd.uscourts.gov/mdl.

Defendants moved to dismiss the claims of plaintiffs who did not comply with these orders. The district court denied some requests, and granted others. Appeals were not taken from a great number of dismissal orders,[4] but timely appeals were filed in the matters now before us. We shall consider the factual background, and procedural posture, of these cases individually once we have discussed the general standards by which we review dismissals for failure to comply with court

---

[4]For example, more than 850 claims were dismissed pursuant to defendants' motions to dismiss for failure to comply with CMO 6 in *Allen, Anderson, Hill*, and *Clinton*; of these, 237 pursue a challenge to these dismissals in the *Allen*, *Anderson*, and *Clinton* consolidated appeals.

orders, and the MDL context in which these dismissals were ordered.

II

**[1]** The principles that apply to dismissals for violation of pretrial orders are well established, as are the standards that govern appellate review. Courts are to weigh five factors in deciding whether to dismiss a case for failure to comply with a court order: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 130 (9th Cir. 1987) (quoting *Thompson v. Hous. Auth. of City of Los Angeles*, 782 F.2d 829 (1986) (per curiam)). These factors are "not a series of conditions precedent before the judge can do anything," but a "way for a district judge to think about what to do." *Valley Eng'rs Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998).

We review for abuse of discretion. "Although it is preferred, it is not required that the district court make explicit findings in order to show that it has considered these factors and we may review the record independently to determine if the district court has abused its discretion." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992) (as amended); *Malone*, 833 F.2d at 130; *Henderson v. Duncan*, 779 F.2d 1421, 1424 (9th Cir. 1986). " 'Dismissal is a harsh penalty and is to be imposed only in extreme circumstances.' Nevertheless, we will overturn a dismissal sanction only if we have a definite and firm conviction that it was clearly outside the acceptable range of sanctions." *Malone*, 833 F.2d at 130 (quoting *Henderson*, 779 F.2d at 1423) (internal citation omitted).

*Expeditious resolution of litigation*. As the first of the Federal Rules of Civil Procedure reflects, the public has an over-

riding interest in securing "the just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. Orderly and expeditious resolution of disputes is of great importance to the rule of law. By the same token, delay in reaching the merits, whether by way of settlement or adjudication, is costly in money, memory, manageability, and confidence in the process. We defer to the district court's judgment about when delay becomes unreasonable "because it is in the best position to determine what period of delay can be endured before its docket becomes unmanageable." *Moneymaker v. CoBen (In re Eisen)*, 31 F.3d 1447, 1451 (9th Cir. 1994).

*Court's need to manage its docket.* "District courts have an inherent power to control their dockets. In the exercise of that power they may impose sanctions including, where appropriate, default or dismissal." *Thompson*, 782 F.2d at 831. "It is incumbent upon us to preserve the district courts' power to manage their dockets" without being subject to endless noncompliance with case management orders. *Ferdik*, 963 F.2d at 1261. Rule 16, the central pretrial rule, authorizes a court to manage cases so that disposition is expedited, wasteful pretrial activities are discouraged, the quality of the trial is improved, and settlement is facilitated. It recognizes "the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems." Fed. R. Civ. P. 16(c)(12). The goal is to get cases decided on the merits of issues that are truly meritorious and in dispute. Subsection (f) puts teeth into these objectives by permitting the judge to make such orders as are just for a party's failure to obey a scheduling or pretrial order, including dismissal. Rule 37(b)(2)(C) allows dismissal for failure to comply with discovery plans and orders, and Rule 41(b) permits dismissal for failure of the plaintiff to prosecute or to comply with any order of court. In addition, the Supreme Court has recognized that dismissal "must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanc-

tion, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (per curiam). So have we. *See Allen v. Exxon Corp. (In re the EXXON VALDEZ)*, 102 F.3d 429, 433 (9th Cir. 1996). This factor is usually reviewed in conjunction with the public's interest in expeditious resolution and, as with the first factor, we give deference to the district court "since it knows when its docket may become unmanageable." *In re Eisen*, 31 F.3d at 1452.

*Risk of prejudice to the defendant*. "A defendant suffers prejudice if the plaintiff's actions impair the defendant's ability to go to trial or threaten to interfere with the rightful decision of the case." *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990); *Malone*, 833 F.2d at 131; *In re Eisen*, 31 F.3d at 1453. Failing to produce documents as ordered is considered sufficient prejudice. *Adriana*, 913 F.2d at 1412. Late tender is no excuse. *See, e.g., In re Eisen*, 31 F.3d at 1453; *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002); *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 947, 948 (9th Cir. 1993). The law also presumes prejudice from unreasonable delay. *In re Eisen*, 31 F.3d at 1453 (quoting *Anderson v. Air West, Inc.*, 542 F.2d 522, 524 (9th Cir. 1976)); *Morris v. Morgan Stanley & Co.*, 942 F.2d 648, 652 (9th Cir. 1991) (as amended) (presuming from elapsed time that defendants' ability to defend a case has been prejudiced). The presumption may be rebutted and if there is a showing that no actual prejudice occurred, that fact should be considered when determining whether the district court exercised sound discretion. *In re Eisen*, 31 F.3d at 1452-53 (quoting *Anderson*, 542 F.2d at 524). A plaintiff may proffer an excuse for delay that, if "anything but frivolous," shifts the burden of production to the defendant to show at least some actual prejudice; if it does, the plaintiff must persuade the court that the claims of prejudice are illusory or relatively insignificant in light of his excuse. *Id.* at 1453 (quoting *Nealey v. Transportacion Maritima Mexicana, S.A.*, 662 F.2d 1275, 1281 (9th Cir.

1980)); *Hernandez v. City of El Monte*, 138 F.3d 393, 401 (9th Cir. 1998) (reiterating that the burden of production shifts to the defendant to show at least some actual prejudice only after the plaintiff has given a non-frivolous excuse for delay). In this circumstance prejudice, delay, and excuse all inform the district court's discretion. Prejudice normally consists of loss of evidence and memory, *In re Eisen*, 31 F.3d at 1453; it may also consist of costs or burdens of litigation, although it may not consist of the mere pendency of the lawsuit itself, *Pagtalunan v. Galaza*, 291 F.3d 639, 642 (9th Cir. 2002). That the case is "an involved, complex case increases the prejudice from the delay. Early preparation and participation are essential in such circumstances." *Anderson*, 542 F.3d at 525 (citation omitted). The district court's finding of prejudice "deserves 'substantial deference' because 'the district court is in the best position to assess prejudice.' " *Computer Task Group, Inc. v. Brotby*, 364 F.3d 1112, 1116 (9th Cir. 2004) (quoting *Anheuser-Busch v. Natural Bev. Distribs.*, 69 F.3d 337, 354) (9th Cir. 1995)).

*Disposition on the merits.* We have often said that the public policy favoring disposition of cases on their merits strongly counsels against dismissal. *See, e.g.*, *Hernandez*, 138 F.3d at 399. At the same time, a case that is stalled or unreasonably delayed by a party's failure to comply with deadlines and discovery obligations cannot move forward toward resolution on the merits. Thus, we have also recognized that this factor "lends little support" to a party whose responsibility it is to move a case toward disposition on the merits but whose conduct impedes progress in that direction. *See, e.g.*, *In re the EXXON VALDEZ*, 102 F.3d at 433 (noting that plaintiffs' total refusal to provide discovery obstructed resolution of their claims on the merits); *In re Eisen*, 31 F.3d at 1454 (giving weight to the plaintiff's failure to specify why it is important that his actions be resolved on their merits); *Morris*, 942 F.2d at 652 (observing that it is the responsibility of the moving party to move toward disposition on the merits).

*Availability of less drastic sanctions.* " 'The district court abuses its discretion if it imposes a sanction of dismissal without first considering the impact of the sanction and the adequacy of less drastic sanctions.' " *Malone*, 833 F.2d at 131-32 (quoting *United States v. Nat'l Med. Enters., Inc.*, 792 F.2d 906, 912 (9th Cir. 1986)).[5] Factors that indicate whether a district court has considered alternatives include: "(1) Did the court explicitly discuss the feasibility of less drastic sanctions and explain why alternative sanctions would be inadequate? (2) Did the court implement alternative methods of sanctioning or curing the malfeasance before ordering dismissal? (3) Did the court warn the plaintiff of the possibility of dismissal before actually ordering dismissal?" *Id.* at 132. While helpful and encouraged, explicit discussion of alternatives is not necessary for a dismissal order to be upheld. *Id.* Warning that failure to obey a court order will result in dismissal can itself meet the "consideration of alternatives" requirement. *Estrada v. Speno & Cohen*, 244 F.3d 1050, 1057 (9th Cir. 2001); *Malone*, 833 F.2d at 132-33; *Adriana*, 913 F.2d at 1413; *Ferdik*, 963 F.2d at 1262. Although a warning is not always required, *Adriana*, 913 F.2d at 1413; *Malone*, 833 F.2d at 132; *Anheuser-Busch*, 69 F.3d at 353, we focus more closely on the lack of warning and absence of consideration of less drastic alternatives when the dismissal is *sua sponte* rather than in response to a noticed motion. *See Oliva v. Sullivan*, 958 F.2d 272, 274 (9th Cir. 1992). *Compare In re Eisen*, 31 F.3d at 1455, *and Morris*, 942 F.2d at 652 (rejecting a warning requirement in a case involving a noticed motion to dismiss), *with Oliva*, 958 F.2d at 274 (reversing a dismissal

---

[5]*Malone* notes that "[a]lternative sanctions include: 'a warning, a formal reprimand, placing the case at the bottom of the calendar, a fine, the imposition of costs or attorney fees, the temporary suspension of the culpable counsel from practice before the courts, . . . dismissal of the suit unless new counsel is secured . . . preclusion of claims or defenses, or the imposition of fees and costs upon plaintiff's counsel. . . ." *Id.* at 132 n.1 (quoting *Titus v. Mercedes Benz of N. Am.*, 695 F.2d 746, 749 n.6 (3rd Cir. 1982)). Giving another chance following a failure to comply is also a sanction, albeit a lenient one. *Id.*

because the court *sua sponte* dismissed a case without considering alternative sanctions or giving a warning), *and Hamilton v. Neptune Orient Lines, Ltd.*, 811 F.2d 498, 500 (9th Cir. 1987) (reversing a district court's *sua sponte* dismissal of a case because it failed to warn prior to dismissal). However, for the prior implementation of a lesser sanction to be a persuasive factor, it must have occurred after the plaintiff's violation of a court order. *See Yourish v. Cal. Amplifier,* 191 F.3d 983, 992 (9th Cir. 1999); *Pagtalunan*, 291 F.3d at 643.

**[2]** We have been guided by the same dismissal factors in complex as well as ordinary cases. For example, we applied these factors in determining whether dismissal for failure to comply with discovery obligations was warranted in the litigation arising out of the *EXXON VALDEZ* oil spill, which involved "scores of lawsuits and thousands of litigants." 102 F.3d at 433. There, we also took note of the fact that, even though the appeal concerned only a fraction of the parties in the overall litigation, the district court appropriately considered the importance of sanctions as a deterrent to noncompliance by the thousands of other plaintiffs in the litigation. *Id*. However, we have never before addressed the issue of dismissals for failure to comply with case management orders in the context of multidistrict litigation. As we recognized in *Toussaint v. McCarthy*, "the scope of review will be directly related to the reason why that category or type of decision is committed to the trial court's discretion in the first instance." 801 F.2d 1080, 1088 (9th Cir. 1986). As we shall explain, administering cases in multidistrict litigation is different from administering cases on a routine docket, so the lens through which the district court — and we, in turn — view transgressions, and sanctions, is different as well.

III

**[3]** The goal of the multidistrict litigation process is to "promote the just and efficient conduct" of "civil actions involving one or more common questions of fact" that are

pending in different districts. 28 U.S.C. § 1407(a). If realized, hundreds or — as here, thousands — of cases, coordinated, will proceed toward resolution on the merits with less burden and expense overall than were each litigated through pretrial individually.

Section 1407 arose out of the federal courts' experience with a massive prosecution of electrical equipment manufacturers for antitrust violations, which had been rendered manageable only by conducting joint pretrial proceedings. *See* H.R. Rep. No. 1130, 90th Cong., 2d Sess. 1 (1968), reprinted in 1968 U.S.C.C.A.N. 1898, 1899.[6] Although the parties had voluntarily agreed to consolidate their cases in that instance, Congress saw a need to create a mandatory version of that procedure to govern cases such as "civil antitrust actions . . ., common disaster (air crash) actions, patent and trademark suits, products liability actions and securities law violation actions, among others." *Id.* at 1900. It therefore created the Judicial Panel on Multidistrict Litigation and conferred on the Panel the power to consolidate pretrial proceedings for such cases and to assign them to a single judge who would coordinate them.

This procedure was meant to "assure uniform and expeditious treatment in the pretrial procedures in multidistrict litigation." *Id.* at 1901. Without it, "conflicting pretrial discovery demands for documents and witnesses" might "disrupt the functions of the Federal courts" as they nearly had in the electrical equipment company cases. *Id.* at 1899. One of the Panel's first rulings described the alternative as "multiplied delay, confusion, conflict, inordinate expense and inefficiency." *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 495

---

[6]The judges who coordinated the electrical engineering cases contributed their experience to the *Manual on Complex and Multidistrict Litigation*, which was developed in tandem with the proposed legislation that ultimately became § 1407. Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 3861 (2d ed. 1986).

(J.P.M.L. 1968). It was thought that consolidation and central coordination would avoid these dangers and would yield significant benefits of economy and speed. As a former Executive Attorney to the Panel and the Executive Editor of the *Manual for Complex and Multidistrict Litigation* wrote: "Implicit in Section 1407 is the assumption that the transferee judge will, as did the judges in the electrical equipment company cases, establish a national unified discovery program to avoid delay, repetition and duplication and to insure that the litigation is processed as efficiently and economically as possible." John T. McDermott, "The Judicial Panel on Multidistrict Litigation," 57 F.R.D. 215, 217 (1973).

Transfer proceedings may be commenced either on the Panel's own initiative or — as in MDL 1407 — by motion of any party. 28 U.S.C. § 1407(c). The Panel analyzes each group of cases in light of the statutory criteria and the primary purposes of the MDL process to determine whether transfer is appropriate. *See In re Food Lion, Inc., F.L.S.A. Effective Scheduling Litig.*, 73 F.3d 528, 532 (4th Cir. 1996); *see also* Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION § 20.131 at 220 (4th Ed. 2004) (citing *In re Plumbing Fixture Cases*, 298 F. Supp. 484 (J.P.M.L. 1968)); MULTIDISTRICT LITIGATION MANUAL § 5.16 (noting that factors considered by the Panel also include the progress of discovery, docket conditions, familiarity of the transferee judge with the relevant issues, and the size of the litigation). A transfer is effective when the order of transfer is "filed in the office of the clerk of the district court of the transferee district." 28 U.S.C. § 1407(c). When the transfer becomes effective, "the jurisdiction of the transferor court ceases and the transferee court has exclusive jurisdiction." MANUAL FOR COMPLEX LITIGATION § 20.131 at 220; *see also* MULTIDISTRICT LITIGATION MANUAL, § 9.1 (explaining that upon transfer of the litigation "the divestment of [the transferor court's] jurisdiction is complete"). A transferee judge exercises all the powers of a district judge in the transferee district under the Federal Rules of Civil Procedure and "may make any pretrial order that the

transferor court might have made in the absence of a transfer." Stanley A. Weigel, *The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts*, 78 F.R.D. 575, 578-79 (1978); *see also* 28 U.S.C. § 1407(b) (authorizing the transferee judge to "exercise the powers of a district judge in any district for the purpose of conducting pretrial depositions"). This includes authority to decide all pretrial motions, including dispositive motions such as motions to dismiss, motions for summary judgment, motions for involuntary dismissal under Rule 41(b), motions to strike an affirmative defense, and motions for judgment pursuant to a settlement. *See* Weigel, 78 F.R.D. at 582-83; MANUAL FOR COMPLEX LITIGATION § 20.131 at 222; 15 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 3866, 618 (2d ed. 1986); *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 102 F.3d 1524, 1532-33 (9th Cir. 1996), *rev'd on other grounds sub nom. Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26 (1998) (noting that "the transferee court is empowered to dispose of the cases transferred to it by means of summary judgment or dismissal"); *In re Donald J. Trump Casino Sec. Litig. —Taj Mahal Litig.*, 7 F.3d 357, 367-68 (3rd Cir. 1993) (holding that "§ 1407 empowers transferee courts to enter a dispositive pre-trial order terminating a case").

Once pretrial proceedings are completed in the MDL, the Panel remands individual cases to the district court in which the action was originally filed for trial. 28 U.S.C. § 1407(a) ("Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district court from which it was transferred unless it shall have been previously terminated . . . ."). When remand occurs depends upon the circumstances of the litigation and the recommendation of the transferee court. MANUAL FOR COMPLEX LITIGATION § 20.133 at 225 (noting that "[t]he Panel looks to the transferee court to suggest when it should order remand, but that court has no independent authority to . . . remand"). In MDL 1407, for instance, Judge Rothstein entered CMO 17

on November 18, 2003, superseded by CMOs 17A, B, and C, that detailed the procedures and conditions she would consider before determining that a case was "ripe for remand." These conditions included completion of discovery permitted by CMOs 1, 6, 6A, 10, 13, 13A, and 15. After an MDL action is remanded, the transferor court resumes exclusive jurisdiction over further proceedings. *Id.* at 226.

[4] A district judge charged with the responsibility of "just and efficient conduct" of the multiplicity of actions in an MDL proceeding must have discretion to manage them that is commensurate with the task. The task is enormous, for the court must figure out a way to move thousands of cases toward resolution on the merits while at the same time respecting their individuality. The court is also confronted with substantial legal questions, such as, in MDL 1407, FDA issues, *Daubert*[7] motions, questions of joinder and federal jurisdiction, class certification, timeliness of claims, and causation. For it all to work, multidistrict litigation assumes cooperation by counsel and macro-, rather than micro-, judicial management because otherwise, it would be an impossible task for a single district judge to accomplish. Coordination of so many parties and claims requires that a district court be given broad discretion to structure a procedural framework for moving the cases as a whole as well as individually, more so than in an action involving only a few parties and a handful of claims. As the Court of Appeals for the First Circuit put it, a district court must be able to "uncomplicate matters" and counsel must, for their part, "collaborate with the trial judge from the outset in fashioning workable programmatic procedures, and thereafter alert the court in a timely manner as operating experience points up infirmities warranting further judicial attention." *Masaro v. Chesley (In re San Juan Dupont Plaza Hotel Fire Litig.)*, 111 F.3d 220, 229 (1st Cir. 1997) (internal quotation marks and citations omitted); *see also* MAN-

---

[7]*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) (setting standards for admissibility of expert opinions).

ual for Complex Litigation, § 10 at 7 ("Fair and efficient resolution of complex litigation requires at least that (1) the court exercise early and effective supervision (and, where necessary, control); (2) counsel act cooperatively and professionally; and (3) the judge and counsel collaborate to develop and carry out a comprehensive plan for conduct of pretrial . . . proceedings.").

Pretrial plans will necessarily vary with the circumstances of the particular MDL. However, the district judge must establish schedules with firm cutoff dates if the coordinated cases are to move in a diligent fashion toward resolution by motion, settlement, or trial. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 172 (1989). As happened in MDL 1407, the multidistrict process contemplates involvement of representative counsel in formulating workable plans. Once established in consultation with counsel, time limits and other requirements must be met and, "when necessary, appropriate sanctions are imposed . . . for derelictions and dilatory tactics." Manual for Complex Litigation § 10.13 at 13. "Close judicial oversight and a clear, specific, and reasonable management program, developed with the participation of counsel, will reduce the potential for sanctionable conduct because the parties will know what the judge expects of them . . . . Although sanctions should not generally be a management tool, a willingness to resort to sanctions, sua sponte if necessary, may ensure compliance with the management program." *Id.* at §10.151 at 15.

In sum, multidistrict litigation is a special breed of complex litigation where the whole is bigger than the sum of its parts. The district court needs to have broad discretion to administer the proceeding as a whole, which necessarily includes keeping the parts in line. Case management orders are the engine that drives disposition on the merits.[8] With this in mind, we

---

[8]A great number of MDL 1407 plaintiffs complied with the court's orders, and their cases moved forward with relative speed. In some

turn to the discrete appeals that arise from dismissals for failure to comply with CMOs 6, 10, 13, 15, and 19.

IV

*Allen* and *Anderson*[9]

In these consolidated appeals, Shantell Allen, et al., and Leon Anderson,[10] et al., appeal dismissal of their actions with prejudice for failure to comply with CMOs 6 and 6A. CMO 6A simply changed the form of the authorizations required by CMO 6, so we treat the appeals as involving CMO 6.

Almost all cases included in the *Allen* and *Anderson* appeals were transferred to MDL 1407 in December 2002. Completed Fact Sheets were due for most members of the *Allen* group and all members of the *Anderson* group in March or April, 2003. Both groups were among the first to be subject to a motion to dismiss for noncompliance with CMO 6, and were dismissed in a pair of orders issued on October 22 and 24, 2003.

Allen and Anderson argue that dismissal was too severe a sanction and that noncompliance with the case-specific discovery requirements of CMO 6 was not the result of willfulness, fault, or bad faith. They proffered several excuses in the

instances, settlement resulted. *See In re Phenylpropanalomine (PPA) Prods. Liab. Litig.*, 227 F.R.D. 553 (W.D. Wa. 2004) (certifying class and approving settlement for plaintiffs alleging injury due to ingestion of Dexatrim). In others, remand for trial. Remand procedures were adopted November 18, 2003, *see* CMO 17, http://www.wawd.uscourts.gov/mdl, and the district court recommended remands in the first wave of cases in March, 2004. *Id.*

[9]*Allen* and *Anderson* are before Judges Leavy, Rymer, and Fisher.

[10]Leon Anderson, the lead plaintiff in case No. 04-35562, was dismissed as a party to the appeal for lack of jurisdiction pursuant to our order dated February 21, 2006. We retain his name in this opinion for convenience to designate the group for whom he was formerly lead plaintiff.

district court, including the difficulty in locating clients, the debilitating nature of the injuries at issue, and the burden of complying with other case management orders (CMOs 13 and 15). The district court was not persuaded, observing that no additional time had been requested, and that the CMO 13 and 15 obligations stemmed from the plaintiffs' own choice to file mass-joinder cases against numerous defendants. Allen and Anderson also contend that some of their plaintiffs tried to cure deficiencies before the defendants moved to dismiss or before the court's order was entered. Allen points out that her group served 114 Fact Sheets after the motion was filed, but the district court found that many of them were incomplete. This finding is not challenged on appeal. Anderson notes that his group submitted a spreadsheet and supporting correspondence establishing that three plaintiffs served some discovery on August 27 or 29, but this was well past the deadlines in CMO 6 and does not excuse failure to take timely action. *See, e.g.*, *In re Eisen*, 31 F.3d at 1453; *Fair Hous.*, 285 F.3d at 906.

[5] Rule 37 sanctions, including dismissal, may be imposed where the violation is " 'due to willfulness, bad faith, *or* fault of the party.' " *Fair Hous.*, 285 F.3d at 905 (quoting the standard articulated in *United States v. Kahaluu Constr. Co., Inc.*, 857 F.2d 600, 603 (9th Cir. 1988)) (emphasis added). "Disobedient conduct not shown to be outside the litigant's control meets this standard." *Fair Hous.*, 285 F.3d at 905; *Virtual Vision, Inc. v. Praegitzer Indus., Inc. (In re Virtual Vision, Inc.)*, 124 F.3d 1140, 1143 (9th Cir. 1997). Our review of the record indicates that failure to comply with CMO 6 was not outside Allen's or Anderson's control. *See In re Virtual Vision*, 124 F.3d at 1145 (holding that a litigant's failure to advise counsel of his whereabouts and failure to keep abreast of the status of his case indicates a lack of due diligence); *W. Coast Theater Corp. v. City of Portland*, 897 F.2d 1519, 1523 (9th Cir. 1990) (holding that "the faults and defaults of the attorney may be imputed to, and their consequences visited upon, his or her client"); *Malone*, 833 F.2d at 134 (same);

*Anderson*, 542 F.2d at 526 (same); *see also Link v. Wabash R.R.*, 370 U.S. 626, 633 (1962). Thus, dismissal was an available sanction.

[6] The district court addressed the *Malone*, or dismissal, factors,[11] and did not abuse its discretion in concluding that dismissal was appropriate. The court observed that many of the cases subject to its dismissal order had been pending for close to, or over, a year without forward movement, and that such lack of diligence does not serve the public interest in expeditious resolution of litigation. This is consistent with *Yourish*, where we explained that dismissal serves the public interest in expeditious resolution of litigation as well as the court's need to manage the docket when a plaintiff's noncompliance has caused the action to come to a halt, thereby allowing the plaintiff, rather than the court, to control the pace of the docket. 191 F.3d at 990. Sound management of the court's docket also counsels in favor of sanctions as a deterrent to others, particularly in the context of an MDL proceeding where there are thousands of plaintiffs and tag-along cases are continually being added. The first two factors therefore weigh heavily in favor of dismissal.

[7] The district court found that the unreasonable delay in completing Fact Sheets prejudiced the defendants' ability to proceed with the cases effectively. It explained that the purpose of the Plaintiff's Fact Sheet was to give each defendant the specific information necessary to defend the case against it, and that without this device, a defendant was unable to mount its defense because it had no information about the plaintiff or the plaintiff's injuries outside the allegations of the

[11]The district court and parties refer to the dismissal factors as "*Malone* factors," probably because our opinion in *Malone* provides a comprehensive discussion of them. 833 F.2d at 130-134. We recognized the importance of the same five factors before *Malone* was decided, but conforming to the practice frequently followed in MDL 1407, we, too, refer to them interchangeably as "*Malone*" or "dismissal" factors.

complaint. We defer to this assessment. The court also found that Allen's and Anderson's inability or unwillingness to furnish the information requested in a timely fashion was not excusable. Deference is due to this finding as well. Failure to produce information without a good reason increases the risk of prejudice from unavailability of witnesses and loss of records. *See Pagtalunan*, 291 F.3d at 642-43 (recognizing that unnecessary delay inherently increases the risk that witnesses' memories will fade and evidence will become stale). This factor, too, supports the district court's determination.

The court found there were no less drastic sanctions remaining. It noted that the named plaintiffs received warning letters from defendants that prompted no response. It also noted that the sanction of preventing remand of the cases where discovery requirements were unmet had previously been imposed in CMO 10, and that it had ordered the time for completing case-specific discovery not to begin to run until a substantially complete PFS was furnished. Having provided second and third chances following procedural defaults, the district judge believed the ultimate sanction of dismissal was justified. As the recitation of events was correct, and the district judge was in the best position to evaluate their import, this factor weighs in favor of dismissal.

Finally, the district court acknowledged that disposition should be on the merits, but found that in light of the inability of many of the named plaintiffs to provide any information that only they possessed regarding the critical elements of their claims, it was impossible to dispose of the case on the merits. Allen and Anderson quarrel with the "impossibility" of it, but we agree with the district court's basic assessment because, in a proceeding such as this, where the plaintiffs themselves prevent their cases from moving forward, the public policy favoring resolution on the merits cannot weigh much, if at all, in their favor. *See In re the EXXON VALDEZ*, 102 F.3d at 433; *Morris*, 942 F.2d at 652 (placing responsibility on the plaintiff to move towards disposition on the merits).

**[8]** Accordingly, the district court did not abuse its discretion in dismissing these actions.

V

*Alford*[12]

Keva Alford and Earlene Johnson were dismissed (along with other individuals originally named as part of the *Alford* action) with prejudice for failure to comply with CMO 6. Alford failed to file a timely PFS, and Johnson failed to file authorizations.

Johnson was served with a blank PFS on February 3, 2004, which meant that her completed Fact Sheet was due on March 19, 2004. On March 17, 2005, Johnson sought an extension until April 19, 2004, which the district court granted. Johnson timely submitted her PFS on April 19, 2004, but she did not submit the required authorization forms that were necessary to obtain her medical records and financial documents. On June 8, 2004, an omnibus motion was filed under Fed. R. Civ. P. 41(b) seeking the sanction of dismissal, pursuant to Fed. R. Civ. P. 37(b)(2)(C), for actions where the plaintiffs had failed to provide a timely, completed PFS. On June 14, 2004, six days after the motion was filed and nearly two months after the authorizations were due, Johnson supplemented her PFS with the required authorizations.

Alford was served with blank Fact Sheets on March 16, 2004, which she was required to complete by April 9, 2004. She filed nothing. Defendants' Liaison Counsel sent Alford a warning letter dated April 13, 2004, which stated:

> You must serve a completed Plaintiff's Fact Sheet upon [defense counsel] . . . within 30 days of the date of this warning letter . . . . Should you fail to

---

[12]*Alford* is before Judges Leavy, Rymer, and Fisher.

provide complete responses within the allowed time-frame, defendants will be entitled to move the Court for appropriate relief.

Please be advised that, should you fail to comply with this deadline, the period for fact witness discovery will not begin to run until you serve a substantially complete Plaintiff's Fact Sheet . . . .

Alford did not serve completed Fact Sheets within thirty days of the warning or request an extension of time to complete them. As a result, she was also included in the June 8, 2004 motion to dismiss. By then, Fact Sheets had been submitted on behalf of only two of the thirty-two plaintiffs in the *Alford* action.

In response to the motion to dismiss, Alford's counsel, W. Thomas McCraney, III, argued that he had assumed that a copy of the warning letter had been sent to Herrington & White, PLLC, lead counsel in Alford's case, and thought Herrington & White would request more time. However, McCraney never tried to verify that Herrington & White had received the letter; he claimed that he was heavily involved in a two-week trial on an unrelated matter at the beginning of May, and was busy filing separate complaints as required by CMO 15.

The district court granted the motion to dismiss. It was not persuaded by McCraney's claim that the failure to file timely Fact Sheets was a result of an administrative mix-up, noting that he had demonstrated awareness of CMO 6 obligations by actually filing a timely PFS in at least two cases. The court also noted that service of a PFS on a lead attorney for a given plaintiff was deemed sufficient. Finally, the district court found that counsel's trial commitments and the deadlines for filing individual complaints are routine demands of legal practice which do not excuse failure to file timely Fact Sheets or, at the least, to request an extension of time.

**[9]** Johnson and Alford argue that dismissal was too harsh a sanction, but our review of the record indicates that failure to comply with CMO 6 was not outside Johnson's and Alford's control. *See W. Coast Theater*, 897 F.2d at 1523 (holding that "the faults and defaults of the attorney may be imputed to, and their consequences visited upon, his or her client"); *Malone*, 833 F.2d at 134 (same); *Anderson*, 542 F.2d at 526 (same); *see also Link*, 370 U.S. at 633.

*Alford* differs from *Allen* in that the district court did not explicitly discuss the *Malone* factors. However, the court had gone through the *Malone* factors in its foundational analysis of failure to comply with CMO 6 in early rulings such as *Allen*, and we assume that Judge Rothstein, one of the most experienced district judges in the country, understood the dismissal factors as they applied to MDL 1407. In any event, considering the record in light of those factors ourselves, we conclude that the district court had discretion to dismiss the *Johnson* and *Alford* actions. The first two factors strongly support the court's decision. As we have discussed, this was complex, multidistrict litigation involving thousands of plaintiffs who claimed to have suffered PPA-related injury. "[T]he weight of the docket-managing factor depends upon the size and load of the docket . . . ." *Pagtalunan*, 291 F.3d at 644 (Trott, J., concurring). Here, given the size and complexity of MDL 1407, the docket-managing factor is weighted heavily in favor of dismissal.

CMO 6 set forth a framework for streamlined discovery. When "despite the efforts of the Defendants' and the Plaintiffs' Steering Committee," many plaintiffs were still delinquent eight months later, the court entered CMO 10 to increase the incentive for compliance by foreclosing remand until plaintiffs had completely complied with discovery orders. Neither individually nor collectively could the MDL cases move forward toward settlement or trial until compliance was achieved. Further, noncompliance with discovery orders diverted the court's attention from time it could have

devoted to other matters. *See Ferdik*, 963 F.2d at 1261 ("It is incumbent upon us to preserve the district courts' power to manage their dockets without being subject to . . . endless . . . noncompliance . . . .").

Johnson and Alford contend that some delay in completing Fact Sheets was inevitable, but they took this decision away from the district court, where it belongs, by ignoring the order instead of asking for relief. *See Pagtalunan*, 291 F.3d at 642 ("The trial judge is in the best position to determine whether the delay in a particular case interferes with docket management and the public interest."). The information called for was solely within the plaintiffs' knowledge. It was basic information about ingestion and injury that was critical to plaintiffs' cases as well as to the defense, for without the information plaintiffs' claims would lack merit. CMO 6 arranged for it to be transmitted to defendants in a form that is far simpler and easier to deal with than interrogatories, the more customary form of first-stage discovery that can be both cumbersome and tedious.

**[10]** Prejudice from unreasonable delay is presumed. *In re Eisen*, 31 F.3d at 1452-53. Failure to produce documents as ordered is sufficient prejudice, whether or not there is belated compliance. *Id.* at 1453 (taking action after the defendant's motion to dismiss was pending does not excuse taking no action before); *Payne v. Exxon Corp.*, 121 F.3d 503, 508 (9th Cir. 1997) (noting that last-minute tender of documents does not cure prejudice or restore other litigants on a crowded docket to the opportunity to use the courts); *see also Adriana*, 913 F.2d at 1413 n.6 (recognizing that refusal to produce evidence presumptively shows that an asserted claim or defense is meritless). The risk of prejudice is exacerbated where each delay potentially affects the discovery and remand schedule in hundreds of other cases. Although a plaintiff's excuse for default or delay is relevant, the district court found Alford and Johnson's explanation unavailing. We defer to this finding, which is not clearly erroneous. *Computer Task Group*, 364

F.3d at 1116 (holding that appellate court owes deference to the district court's finding that excuses are not credible). We also note that CMO 15, which counsel maintained was consuming his time, itself states that "[n]othing in this Case Management Order shall delay the production of Plaintiff Fact Sheets by plaintiffs named in multiple plaintiff cases." CMO 15, ¶ 3. Therefore, the prejudice factor weighs in favor of dismissal.

The availability of less drastic sanctions was not discussed by the district court, nor did Johnson or Alford propose any. They maintain that to the extent they were in violation of CMO 6, no lesser sanction was imposed before proceeding directly to dismissal. While true as to them individually, CMO 10 reflects the court's awareness of widespread non-compliance with CMO 6 and consideration of alternative measures to remedy it. Although the court did not individually warn Johnson and Alford of the possibility of dismissal for failure to comply, the text of CMO 1, and of Rules 37(b)(2) and 41(b), give notice that dismissal is a possible sanction for failure to obey pretrial discovery orders. *Valley Eng'rs*, 158 F.3d at 1056-57. Also, the district court warned all MDL 1407 plaintiffs that any case where plaintiffs failed to comply with discovery orders would be dismissed; other cases had been dismissed for failure to comply with CMO 6, *see, e.g.*, *Allen v. Bayer*, No. 04-35370; *Anderson v. Bayer*, No. 04-35562, and this, too, amounted to a warning that similar conduct would result in a similar sanction. *See Valley Eng'rs*, 158 F.3d at 1057. In addition, the court had instructed defendants diligently to pursue filing motions to dismiss for failure to comply with CMO 6 before Alford and Johnson let the deadline go by. Although composed of hundreds of actions, MDL 1407 was a unified proceeding for pretrial purposes so its MDL-wide rulings applied to all parties. Further, in accordance with CMO 6's compliance plan, Defense Liaison Counsel's April 13, 2004 letter advised Alford that she was in default of CMO 6 obligations and warned that appropriate relief would be requested unless complete responses were

forthcoming within 30 days (the extra time frame allowed by CMO 6 for compliance after warning). These warnings satisfy this factor in this case. *See, e.g.*, *Ferdik*, 963 F.2d at 1262 (recognizing that a warning can satisfy the "consideration of alternatives" requirement); *Malone*, 833 F.2d at 132 & n.1 (noting that a warning is an alternative sanction, and that case law suggests that warning a plaintiff that failure to obey a court order will result in dismissal can suffice).

The fifth factor — public policy favoring disposition of cases on the merits — normally weighs against dismissal. However, failure to comply with CMO 6 obligations brought these MDL actions to a standstill. Noncompliant plaintiffs bear responsibility for halting movement toward a merits resolution. The consequences are compounded in multi-plaintiff actions in multidistrict litigation. This substantially neutralizes the negative effect of this factor in the context of this proceeding.

**[11]** On balance, we conclude that dismissal was not an abuse of discretion.

**Volume 2 of 2**

## VI

### *Clinton*[13]

Betty Clinton, Barbara Evans, Paulette Green, and Joe Johnson were served with a blank PFS on March 21, 2002 after their actions were transferred to MDL 1407 in late 2001 and early 2002. Completed Fact Sheets and authorization forms were due May 6, 2002. While Clinton and Green applied for extensions, and Green received one, all members of the Clinton group served a late, and incomplete, Fact Sheet (including Green, who didn't provide hers until after her extension expired). Numerous deficiency letters were sent to

---

[13]The *Clinton* appeals are before Judges Leavy, Rymer, and Fisher.

each up to the time motions to dismiss were filed March 5, 2004. The district court found that plaintiffs in the *Clinton* actions failed to comply with the discovery plan set forth in CMOs 6 and 10 despite ample opportunity to comply, as well as warnings that failure to comply would result in appropriate sanctions — including dismissal. It also found outstanding deficiencies as to all the *Clinton* discovery responses.

**[12]** Clinton, Evans, Green, and Johnson argue that dismissal was too severe a sanction and that noncompliance was not the result of willfulness, bad faith, or fault. Additionally, they posit that the delay in their cases was only slight, and was due to counsel's difficulty obtaining the required information from clients who had been injured by ingestion of PPA-containing products. We disagree that the delay was "slight," as it continued for nearly two years. While the district court made no express finding of fault, we may review the record to determine whether it contains evidence of willfulness, bad faith, or fault. *See In re Virtual Vision*, 124 F.3d at 1143. Our review indicates that failure to comply with CMO 6 was not outside Clinton's control, thus satisfying the fault standard for imposing Rule 37 sanctions. *Fair Hous.*, 285 F.3d at 905; *In re Virtual Vision*, 124 F.3d at 1143-44; *W. Coast Theater*, 897 F.2d at 1523. No member of the *Clinton* group substantiated counsel's claim of incapacitation or explained why alternative approaches, such as a protective order or further extensions of time, were not pursued. Dismissal was therefore an available sanction.

**[13]** Considering the dismissal factors here leads us to conclude that dismissal was not an abuse of discretion. For reasons we have already explained, the first two tip in favor of dismissal. Prejudice is presumed from unreasonable delay, *In re Eisen*, 31 F.3d at 1452-53, and the Clinton group failed to file a PFS that was not deficient within the deadline set by the court, or for two years thereafter. *See Pagtalunan*, 291 F.3d at 643 (observing that unreasonable delay inherently increases the risk of prejudice from faded memories and stale evi-

dence). Although two of these plaintiffs asked for extensions (and one received a year of additional time), substantially complete Fact Sheets were not submitted until after the motion to dismiss was filed two years after originally due. This neither excuses, nor cures, prejudice. *Fair Hous.*, 285 F.3d at 906; *Payne*, 121 F.3d at 508.

While the district court did not explicitly discuss the availability of less drastic sanctions in its dismissal order, it found that the Clinton group had received warnings. *See Ferdik*, 963 F.2d at 1262. It is also apparent from the record that the court considered progressive sanctions, as we have already explained.

Finally, given plaintiffs' responsibility for moving their cases toward resolution, public policy favoring disposition of cases on the merits offers little support in their favor.

In these circumstances, dismissal was within the court's discretion.

## VII

### *Page*[14]

Elizabeth Page appeals dismissal of her action with prejudice for failure to comply with CMO 19. Page's action was transferred to MDL 1407 on August 7, 2003. Bayer served a blank PFS on Page on August 19, 2003, so she was required by CMO 6 to furnish a complete Fact Sheet by October 3, 2003. On October 7, Bayer sent a warning letter to Page informing her that she was not complying with CMO 6. On November 17, 2003, Page returned the PFS, but Bayer noted a number of deficiencies, including a lack of release forms and incomplete answers to questions regarding health and

---

[14]*Page* is before Judges D. Nelson, Rymer, and Fisher.

employment issues, of which it informed Page by a warning letter on March 10, 2004. Page did not respond to the letter.

On March 16, 2004, Mohammad Syed, an associate at the law firm representing Page who was involved in her case, but was not counsel of record, departed for a vacation in the Middle East. Due to "administrative red tape," the trip was prolonged and the record does not reflect when, or if, he returned. On April 14, 2004, Bayer sent a third warning letter again notifying Page of deficiencies in the PFS; a fourth was sent on May 14, 2004. Finally, on May 17, 2004, Page responded by sending the requested forms. The next day, Page informed Bayer of Syed's absence, requested that Bayer resend the warning letters, and promised to correct the deficiencies "as soon as practical." Bayer resent the letters the next day via fax. On August 9, 2004, having still not received the supplemental PFS that Page had promised, Bayer sent a fifth warning letter, which informed Page that, pursuant to CMO 19, Bayer would seek dismissal if Page did not send a complete PFS. On August 23, 2004, the post-warning grace period allowed under CMO 19 expired. On September 2, 2004, Bayer sought dismissal of Page's case, and on September 7, 2004, the district court issued an Order to Show Cause (OSC) why Page's case should not be dismissed. On September 20, 2004, Page responded to the order and appended a supplemental PFS, which addressed many, but not all, of Bayer's asserted deficiencies.

Page admitted that there were "absences" and "failing[s] in Plaintiff's fact sheet" and that Bayer was "certainly entitled to complete answers to the questions on the fact sheet." She conceded that Bayer "certainly was within its rights" to seek dismissal under CMO 19 and that she had committed "error in failing to transmit" the supplemental Fact Sheet to Bayer. She accepted "responsibility for that delay." Nevertheless, Page tried to excuse the delay by arguing that the revised PFS had been completed some time prior to the motion to dismiss, but had simply not been given to Bayer because "counsel . . .

inadvertently forgot to send those responses." Page argued that the errors and omissions in the original PFS were merely technical. In light of that inadvertence, Syed's absence from the country, and the alleged mildness of the omissions, Page argued that dismissal was too harsh a sanction. The district court found that Page's excuses were not a reasonable justification for the delay and that Bayer had been prejudiced.

Page now argues that the district court erred as a matter of law because her original PFS was "complete in all respects" as defined by CMO 19. Even if Page had not waived this issue by failing to raise it in district court, Page conceded that Bayer was within its rights to seek dismissal for violation of CMO 19, that there were absences and failings in her PFS, and that she failed to transmit the supplemental Fact Sheet to Bayer. Page also maintains that Bayer had answers to the PFS's requests for technical information in other forms, but we rejected a similar argument in *Computer Task Group*. 364 F.3d at 1117. The reason is that "[a]n important purpose of discovery is to reveal what evidence the opposing party has, thereby helping determine which facts are undisputed — perhaps paving the way for a summary judgment motion — and which facts must be resolved at trial." *Id.* Finally, it is not without significance that Page never sought a protective order or other relief from her discovery obligations.

**[14]** Although the district court's order does not explicitly reflect a *Malone* analysis, it was entered with reference to the parties' memoranda, which did. In any event, we can review the record independently and, having done so, conclude that the dismissal factors support the district court's determination. As we have discussed, the first two factors strongly support the court's dismissal. The district court found prejudice, which is presumed from unreasonable delay. *In re Eisen*, 31 F.3d at 1453. Page failed to submit a compliant PFS for over a year, and this suffices to show prejudice even if there is belated compliance. *Payne*, 121 F.3d at 508. Although a plaintiff's excuse for default or delay is relevant, the district

court found that Page proffered no reasonable justification. The public policy favoring disposition on the merits is not compelling when it is thwarted by the plaintiffs' failure to move their cases along. While the availability of less drastic sanctions was not discussed in the order, the district court can sometimes meet the "consideration of alternatives" requirement by issuing a warning that a party's failure to obey a court order will result in dismissal. *See Estrada*, 244 F.3d at 1057; *Ferdik*, 963 F.2d at 1262; *Malone*, 833 F.2d at 132-33. The logistical complexity involved in multidistrict litigation makes it impossible to issue personalized warnings to each one of thousands of parties and give second (or, in some cases, third, fourth, or fifth) chances based on each party's unique circumstances. An MDL court facing widespread non-compliance with its orders may satisfy the need for consideration of lesser sanctions, as the district court did here, by implementing progressively more severe penalties and issuing warnings in MDL-wide case management and scheduling orders, served at the outset of a party's transfer to the MDL.[15] The progression from CMO 6 to CMO 19 indicates that alternatives were considered; Bayer followed the compliance plan incorporated into these case management orders in this case; and, in the wake of widespread noncompliance with earlier discovery orders, the parties to MDL 1407 had been warned by the district judge that future noncompliance could lead to dismissal. Accordingly, we conclude the district court adequately considered its alternatives before dismissing Page's action. Thus, in light of the full *Malone* analysis, the district court did not abuse its discretion.

---

[15]While our case law suggests some temporal guidelines for issuance of a warning in ordinary litigation, *see Pagtalunan*, 291 F.3d at 643 (suggesting a warning may be inadequate if it did not occur after the plaintiff's violation of a court order), such guidelines have no salience in the MDL context and would make it impossible to administer the vast number of cases in an MDL. As these guidelines have never been extended to the MDL context, we decline to extend them now as doing so would render an MDL unworkable.

VIII

*Riley*, *Holmes*, *Samuels*, and *McDaniel*[16]

Marie Riley, Bobby Holmes and his family, Melody McDaniel, and Samantha Samuels, et al. appeal dismissal of their actions with prejudice for failure to comply with CMO 19.

Riley's case was transferred to MDL 1407 on April 29, 2003; a year later, Bayer sent a deficiency notice with respect to the incomplete PFS that Riley had submitted, signed by her daughter who was not a party. Although she then supplemented the PFS, it, too, was unsigned. Bayer sent another deficiency notice August 12, warning of its intent to seek dismissal if completed documents were not received within 15 days (the additional period allowed by CMO 19). An OSC was served under CMO 19; counsel responded that Riley was unable to complete the PFS due to her deteriorating health, but that her daughter had personal knowledge of Riley's stroke as well as ingestion of PPA-containing products and that a power of attorney was being sought for her. None was obtained by November 17, 2004, when the dismissal order was entered. The court noted that no justification was offered for the daughter's failure to obtain a power of attorney for nearly five months, and that defendants were prejudiced by this considerable delay.

Samuels's case was transferred January 11, 2002, before CMO 6 was entered. Five deficiency letters were sent between May 31, 2002 and July 14, 2004; the final letter had a CMO 19 warning. Samuels submitted an unsigned supplemental response, without authorizations, to Bayer on July 20, 2004; an OSC was issued September 9; and Samuels provided a signed PFS October 11, 2004 two weeks after the time to respond to the OSC expired. The district court found that

---

[16]The *Riley* appeals are before Judges D. Nelson, Rymer, and Fisher.

Samuels had been given numerous warnings, which she had consistently ignored, and that her excuse — counsel had written to her on July 21, 2004 emphasizing the importance of signing the PFS and providing signed releases that would be turned over to defense counsel upon receipt — was unpersuasive. It found prejudice on account of Samuels's failure to comply with court-ordered discovery.

Holmes's case was transferred January 10, 2002. He died shortly before his PFS was due (May 7). Co-plaintiffs sent unsigned, unverified PFS responses. Three deficiency notices were sent between May 31, 2002 and January 2003; Holmes's daughter was deposed in April 2004, but lacked key information about her father's injury and ingestion of PPA; two more deficiency letters were sent on May 11 and August 13, 2004, the last one with a CMO 19 warning. An OSC was issued on September 7, to which counsel responded that he had located Holmes's former girlfriend who was percipient to the stroke, and that he was preparing another supplemental PFS. The court noted that counsel made no attempt to explain why two years had elapsed from the original PFS due date before trying to locate the girlfriend; that despite repeated requests, extensions, and warnings, counsel still had failed to file a PFS that was complete in all respects; and that no reasonable justification was offered for the failure. It also found prejudice to the defense by failure to comply with court-ordered discovery.

Finally, McDaniel's case was transferred to MDL 1407 on September 24, 2003. Bayer sent a deficiency notice with respect to her incomplete PFS on March 8, 2004; she responded with a supplement signed by counsel; another deficiency notice with a CMO 19 warning was sent August 11, 2004, and an OSC was issued September 7, 2004. McDaniel indicated that her counsel had difficulty locating her after she moved from Mississippi to Missouri and disconnected her phone. She also sent Bayer an unsigned supplemental response. On October 8, 2004 after the time for responding to

the OSC had lapsed, McDaniel fowarded signed authorization forms to Bayer. The court observed that it was undisputed that McDaniel had failed to serve a timely PFS that was complete in all respects, and noted of the proffered excuse that counsel had not sought an extension of the deadline from the court on account of inability to reach McDaniel. It found that counsel's inability to communicate with his client was not sufficient justification for failure to comply with court-ordered discovery; that adequate warnings had been given of the consequences of failure to comply with CMO 19; and that the defendants were prejudiced by this failure.

## A

Bayer, the lead defendant in Holmes's case, contends that the *Holmes* appeal is untimely. We address this first, as our jurisdiction depends upon the filing of a timely notice. We believe that Holmes filed on time. Holmes brought a motion for reconsideration within 10 days of the district court's entry of judgment, thereby tolling his time to file a notice of appeal. He then filed his notice of appeal within 30 days of the district court's denial of his motion for reconsideration. This comports with the rules and gives us jurisdiction. *See* Fed. R. App. P. 4(a)(4)(A)(vi); Fed. R. App. P. 4(a)(7); *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1462 (9th Cir. 1992).

## B

**[15]** Riley, Holmes, and Samuels argue that the district court abused its discretion by dismissing their claims without finding willfulness, fault, or bad faith as our precedent requires for Rule 37 sanctions. *See, e.g.*, *Fair Hous.*, 285 F.3d at 905. Beyond this, Riley and Holmes maintain that counsel had difficulty locating the information needed to cure deficiencies in the PFS due to Holmes's death and Riley's mental and physical condition; Samuels claims that she served an unsigned copy of a supplemental PFS; and McDaniel contends that she substantially complied with CMO 19 and thus

was not at fault. The district court found no reasonable justification for failure to file a PFS on time, which is tantamount to a determination of fault. Our review of the record also indicates that failure to comply with CMO 19 was not outside the litigants' control, which satisfies the standard for imposing sanctions. *Id.*; *In re Virtual Vision*, 124 F.3d at 1143-44; *W. Coast Theater,* 897 F.2d at 1523. None of these parties sought more time or the court's approval for a different approach to allow for unusual difficulties. Nor does *substantial* compliance show the absence of fault, as McDaniel maintains, because CMO 19 requires *complete* compliance. Her failure to sign the PFS was unexplained, and there is no indication that she was unable to stay in touch with counsel. Thus, dismissal was an available sanction for each of these parties.

Weighing the dismissal factors, we conclude that the district court had discretion to dismiss. Although the district court did not explicitly discuss *Malone* in this case, it was not required to. *See, e.g.*, *Ferdik*, 963 F.2d at 1261. Our review of the record indicates that the first two factors strongly support the district court's decision. CMO 6 set forth a framework for discovery that was tightened in CMO 10 when many plaintiffs failed to comply, and again in CMO 19 when delinquencies still existed more than two years later. The *Riley* actions had been pending in MDL 1407 for one to three years, during which period defense discovery, triggered by completed Fact Sheets, could not begin.

The district court found prejudice and we are not firmly convinced this is wrong, as prejudice is presumed from unreasonable delay. *In re Eisen*, 31 F.3d at 1452-53. These actions were stalled for anywhere from one to three years. Without a completed PFS, a defense could not be mounted, the structure for MDL 1407 discovery — carefully-tailored by court and counsel — was thwarted, and the actions could not move toward remand. Failure to produce documents as ordered is prejudicial, whether or not there is belated compliance. *Payne*, 121 F.3d at 508. A plaintiff's excuse for default or

delay is relevant, and the district court found no reasonable justification for the conduct here. Samuels offered no explanation at all; Holmes's co-plaintiffs failed to explain why they waited two years to try to find another witness who might provide the requested information; Riley's claims of incapacitation are unsubstantiated and her daughter did not obtain a power of attorney until after her action had been dismissed; and McDaniel did not indicate why timely communication was impossible. Accordingly, the prejudice factor weighs heavily in favor of dismissal, and the fourth factor — public policy favoring disposition of cases on the merits — offers little support to plaintiffs in these circumstances.

Although the district court did not explicitly consider the availability of less drastic sanctions, it is apparent from the record that progressive sanctions had been considered. The court had tried in CMO 10 to compel compliance with CMO 6 by deferring the start of a one-year discovery period until the PFS was completed; when that didn't work, it entered CMO 19 requiring submission of a PFS complete in all respects and providing for a warning program that the defense followed in these actions. In each of these cases, letters were sent giving notice of deficiencies, affording Riley, Samuels, Holmes, and McDaniel successive opportunities to comply with the court's orders, and warning of dismissal under CMO 19 should the deficiencies not be corrected. There is no reason the court should have believed that any of these parties would comply in the future. In addition, the text of Fed. R. Civ. P. 37(b)(2) gives notice that dismissal is a possible sanction for failure to obey discovery orders; CMO 1 warns that failure to produce required documents will be treated as an infraction of a court order justifying appropriate sanctions; and the district judge advised all MDL 1407 parties on July 31, 2003 that any case that had not complied with her discovery orders would be dismissed. As Judge Rothstein explained, "the time has come to figure out which of these cases are real and which of them aren't. And if discovery hasn't been complied with, there's a strong presumption on my part that the case should

be dismissed." Further, these dismissals were entered only after the parties had been given an opportunity to explain delay and urge alternative sanctions. In light of the number and clarity of warnings, the court's findings that these parties ignored the warnings, and the progression of CMOs 6, 10, and 19, this factor supports dismissal. *See Ferdik*, 963 F.2d at 1262.

We conclude that dismissal was within the court's discretion.

### IX

### *Ackel*, *Arrington*, and *McGriggs*[17]

Leslie Ackel, et al., Bridgett Arrington, et al., and Calvin McGriggs, et al. appeal dismissal of their actions for failure to file new individual complaints as required by CMOs 15 and 15A, and from denial of their motions for reconsideration. None of the parties to *Ackel*, *Arrington*, or *McGriggs* filed a severed complaint before the deadline set in CMO 15 (June 29, 2003), or requested an extension. However, the *Arrington* and *McGriggs* plaintiffs filed new individual complaints between August 4 and August 19, and the *Ackel* plaintiffs followed suit between August 27 and October 14, 2003.

CMO 15 applied to numerous cases that joined unrelated claims of multiple plaintiffs who allegedly took a PPA-containing product without specifying which product was ingested or which manufacturer caused their injuries. The court found as to all such actions that the threshold requirements for permissive joinder under Rules 20 and 21 of the Federal Rules of Civil Procedure, which provide that multiple plaintiffs may "assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same trans-

---

[17]*Ackel*, *Arrington*, and *McGriggs* are before Judges D. Nelson, Rymer, and Fisher.

action, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action," could not be met because the multiple-plaintiff cases did not seek relief arising from the same transaction or occurrence. Thus, severance of the individual plaintiffs was proper. In addition, the court noted that under Rule 21(b), "[t]he court may make such orders as will prevent a party from being embarrassed, delayed, or put to expense by the inclusion of a party against whom the party asserts no claim and who asserts no claim against the party, and may order separate trials or make other orders to prevent delay or prejudice." Accordingly, it ordered individual new complaints, which would relate back to the date of the original complaint, to be filed within 30 days in all cases that contained multiple plaintiffs.

CMO 15A, entered August 26, 2003, served as an adjunct to CMO 15 to give the parties a mechanism for resolving "noncompliant" severed complaints and dismissal of original multi-plaintiff complaints. It allowed defendants to move to dismiss with prejudice the original case as to those plaintiffs who failed properly to file an individual new complaint, and as to those plaintiffs who filed an individual new complaint which did not identify a product manufactured by the moving defendant. CMO 15A also provided that upon motion, noncompliant complaints must be refiled with the appropriate information within 30 days, otherwise dismissal with prejudice would result. In addition, CMO 15A states that 86 original multiple-plaintiff complaints, including *Ackel* and *McGriggs* (of which *Arrington* was then a part) shall be dismissed with prejudice as of the effective date of the order (60 days later, or October 26, 2003), which includes any plaintiffs for whom an individual severed complaint was not timely filed. Simultaneously, the district court entered a separate order providing: "Pursuant to Case Management Orders 15 and 15A, the original multiple plaintiff Complaints listed in Exhibit A to this Order are hereby DISMISSED WITH PREJUDICE." *Ackel* and *McGriggs* are listed in this Exhibit.

By October, some plaintiffs who had filed untimely severed complaints were taking the position that CMO 15A extended the deadline for filing by 60 days. Defense Liaison Counsel disputed this interpretation, arguing that the August 26, 2003 order dismissed both the original multiple-plaintiff complaints and the claims of plaintiffs who failed to file severed complaints within the 30 days prescribed in CMO 15. Given an opportunity to respond by the court, counsel in *Arrington* admitted to filing late but argued that defense counsel had agreed to extensions; no responses were filed in *Ackel* and *McGriggs*. On October 30, the court entered an order holding that CMO 15 makes clear on its face that new individual complaints were to be filed in any pending multi-plaintiff cases within 30 days, that is, by June 29, 2003, and that nothing in CMO 15A alters that 30-day period. We accept the court's finding of what its order requires. *See Yourish*, 191 F.3d at 991. The court then directed defendants to file a single proposed order of dismissal in all cases in which plaintiffs filed untimely new individual complaints, which they did as to *Ackel*, *Arrington*, and *McGriggs*.

The court rejected Arrington's argument that defendants had agreed to extensions, and Ackel's that filing severed complaints late — but before the proposed orders of dismissal had been served — rendered the issue of compliance moot. It denied Arrington's and McGriggs's motion to reconsider based on oversight of counsel, noting that it is the responsibility of all attorneys to keep track of deadlines relevant to their clients' cases. Beyond this, the court determined that dismissal was warranted under the *Malone* factors. In particular, it found that the practical effect of failure on the part of plaintiffs in multiple-plaintiff cases to file severed complaints specifying the products ingested and the manufacturers causing injury in a timely fashion prevented the cases from moving forward. It also noted that failure to comply with CMO 15 diverted the court's time and resources, and prejudiced defendants because without the information contained in the severed complaints, their ability to defend these cases was

seriously compromised. Further, the court stated that it was impossible to dispose of unsevered cases on the merits, and that unwillingness to file severed complaints or delay in doing so was not excusable.

## A

### *Ackel* and *Arrington*

[16] Ackel and Arrington contend that dismissal is too harsh a sanction and that their delay in filing new individual complaints was not the result of willfulness, fault, or bad faith. To be clear, these are not Rule 37 dismissals for failure to make discovery; rather, they are dismissals for failure to comply with court-ordered severance. Regardless, the district court found their excuses for failing to comply with the court's severance order insufficient, which is tantamount to a determination of fault. Nothing in the record indicates that failure to comply with CMO 15 was outside their control. *See Fair Hous.*, 285 F.3d at 905; *In re Virtual Vision*, 124 F.3d at 1143-44; *W. Coast Theater*, 897 F.2d at 1523.

Considering the dismissal factors, we agree with the district court's assessment of the impact that failing to file severed complaints has on the public interest in expeditious resolution and on its own docket. CMO 15 itself is not challenged on appeal, so whether severance was a needless formality for some individual plaintiffs misses the point of the overall need, and requirement, to break out the allegations in multiple-plaintiff cases. The first two factors therefore weigh strongly in favor of dismissal.

Prejudice is the more difficult question in this case, as the delay in complying was between five and twelve weeks. Five weeks may not seem like too much, but the district court is in the best position to measure the effect of delay on the defendants in these cases and overall. The situation that led to CMOs 13 and 15 had been building for two years during

which defendants in multiple-party complaints did not know what they were defending. In addition, the risk of prejudice is related to the reason for default. *See, e.g.*, *Malone*, 833 F.2d at 131; *Yourish*, 191 F.3d at 992. In *Yourish*, for example, we upheld a dismissal with prejudice when the plaintiff failed to file an amended complaint within the 60 days allowed by a district court order, noting among other things that the paltry excuse for default on the judge's order indicates prejudice to defendants from the delay. Here, Ackel proffered no excuse, and the district court found Arrington's conduct inexcusable.

**[17]** At least two hundred actions were subject to CMO 15 and the court was forced to deal with more than 127 individuals who filed a severed complaint late. Nevertheless, the district court was careful to consider the particular situation and explanation offered by these plaintiffs, with the exception of the *McGriggs* plaintiffs, whose circumstances the court did not address adequately. As to the other plaintiffs, however, Judge Rothstein discriminated among them by holding that the delay caused by a group of ten who filed their severed complaints one day after the deadline was inconsequential. How much delay is too much delay is a matter quintessentially within the discretion of the district judge, who is best situated to balance the degree of delay, the importance of prompt compliance, the effect on her docket and defendants, and the justification. Whether any of us would have drawn the line differently is not the issue; the district court here, fully informed, believed the *Ackel* and *Arrington* delay was consequential. *See Estrada*, 244 at 1056 (reiterating that " 'the question is not whether this court would have, as an original matter, imposed the sanctions chosen by the trial court, but whether the trial court exceeded the limits of its discretion' " (quoting *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 379 (9th Cir. 1988)). In the circumstances of MDL 1407, we cannot say that the district judge lacked discretion to make this call.

Ackel and Arrington also rely on the fact that they had already furnished Fact Sheets and Affirmations naming the

drugs ingested and the respective manufacturers, so defendants could not have been prejudiced by their failure to repeat the same information in a severed complaint. However, that compliant pleadings are ultimately filed does not compel a district court to conclude that failure to comply with a court order doesn't matter. *See Computer Task Group*, 364 F.3d at 1116 (rejecting similar argument); *Payne*, 121 F.3d at 508. Nor are we impressed with the argument advanced by the *Ackel* and *Arrington* plaintiffs that there could be no prejudice because it took defendants over five months from the June 29, 2003 deadline to ask the court for assistance. That delay came about only because of a dispute between plaintiffs and defendants about the effect of the August 26 order dismissing these actions with prejudice.

The district court did not explicitly discuss availability of less drastic sanctions in its order, but it implicitly did by rejecting the *Ackel* plaintiffs' contention that dismissal was too harsh a remedy. Also, the fact that the court examined each case discretely — with the exception of the *McGriggs* plaintiffs, whose situation the court did not properly consider — and determined that no sanctions were warranted in some, and that dismissal was warranted only absent a convincing reason for failure to comply with CMO 15 in others, indicates the court was sensitive to an appropriate level of sanction.

We do not have a firm conviction that the district court "committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors" in *Ackel* and *Arrington*. *Ferdik*, 963 F.2d at 1260; *Yourish*, 191 F.3d at 992 (applying standard).

## B

### *McGriggs*[18]

---

[18]The disposition as to *McGriggs* is authored by Judge Fisher, joined by Judge D. Nelson. Judge Rymer dissents.

The *McGriggs* plaintiffs were dismissed because they filed severed complaints between August 9 and August 19, five weeks after the June 29, 2003 deadline set by CMO 15. On August 26, at least a week *after* the *McGriggs* plaintiffs filed their severed complaints, the district court entered CMO 15A, which provided for dismissal with prejudice of all jointly filed complaints, including the complaints of those like the *McGriggs* plaintiffs, for whom a timely severed complaint had not been filed by the June 29 deadline. Although Fed. R. Civ. P. 37(b)(2) and 41(b) provide notice that dismissal is a possible sanction for failure to obey pretrial discovery orders, *see Valley Eng'rs*, 158 F.3d at 1056-57, CMO 15 gave no explicit warning. And although the district court orally admonished plaintiffs that failure to file severed complaints could result in dismissal, it did so only on July 31, 2003 — more than a month after the June 29, 2003 deadline had passed.

The court's rationale in entering CMO 15 was sensible: each defendant in MDL 1407 needed and was entitled to know the particular plaintiff who was suing it, why that plaintiff was suing it and which product was at issue. Applied to the *McGriggs* plaintiffs, this rationale does not justify the sanction they suffered.

## DISCUSSION

[18] The *McGriggs* plaintiffs comprise two subsets: the *McGriggs* plaintiffs and the *Harris* plaintiffs ("the *McGriggs* plaintiffs"). The district court's *Malone* analysis is inadequate with respect to both subsets because the court did not acknowledge that the initial multiparty complaint each subset filed was already detailed, identifying Bayer as the only defendant in the case of the *McGriggs* subset, and Delaco (and Delaco's successor) in the case of the *Harris* subset. These original multiparty complaints made clear, respectively, that Alka Seltzer Plus Cold and Bayer, and Dexatrim and Delaco (and Delaco's successor), were the sole drugs and

defendants at issue, and the original complaints alleged specific harms suffered by each plaintiff on precise dates. Although the *McGriggs* and *Harris* plaintiffs were necessarily subject to the global application of CMO 15, they rightly argue that filing severed complaints (which they did do, a month and a half late) did not provide the court or defendants with any information they did not previously have. This cannot be said of the *Ackel* and *Arrington* plaintiffs, who were also dismissed with the *McGriggs* plaintiffs, because their original multiparty complaints were not so specific. Whereas "the practical effect of [the] failure on the part of [the *Ackel* and *Arrington* plaintiffs] to file severed complaints specifying the products ingested and the manufacturers causing injury . . . [was to] prevent[ ] the cases from moving forward," *supra* p. 10351, no evidence suggests the *McGriggs* plaintiffs' late compliance caused any such delay.

**[19]** The *McGriggs* plaintiffs' failure timely to obey the court's orders was not prejudicial to the public's interest in the expeditious resolution of litigation or the court's management of the case, much less to defendants. Defendants did not lack details about the injuries alleged by the *McGriggs* plaintiffs. The defendants named in the original *McGriggs* complaint knew what they were defending against. MDL 1407 litigants with no liability exposure in the *McGriggs* cases were not forced to expend unnecessary resources in cases in which they were not true parties.

**[20]** The *McGriggs* plaintiffs blamed their noncompliance with CMO 15 on an oversight of their counsel, who did not think to file separate complaints because the original complaint specifically identified the products and defendants at issue. Given that these excuses were "anything but frivolous," defendants had an obligation to show *actual* prejudice suffered by the delay, *see In re Eisen*, 31 F.3d at 1452-53, a showing they did not make, and cannot make, because they had all the information CMO 15 required in the *McGriggs* plaintiffs' original complaint (as opposed to the *Ackel* and

*Arrington* plaintiffs, whose multiparty complaints were not so detailed). Indeed, far from impairing defendants' "ability to go to trial," *Adriana*, 913 F.2d at 1412, the *McGriggs* plaintiffs' detailed original complaint allowed discovery to proceed, and written discovery to be completed. Accordingly, defendants cannot show loss of memory or evidence. *See In re Eisen*, 31 F.3d at 1453. Although "the district court is in the best position to measure the effect of delay on the defendants in these cases and overall," *supra* p. 10352, and although a district court is not compelled "to conclude that failure to comply with a court order doesn't matter" because "compliant pleadings are ultimately filed," *supra* p. 10354, the circumstances the *McGriggs* plaintiffs present show the limits of these prudential notions. Ultimately, a district court must acknowledge and evaluate the unique circumstances an individual MDL plaintiff presents and act accordingly. Here, the district court's neglect in doing something so basic means that we cannot defer to its finding of prejudice.

**[21]** Fundamentally, the *McGriggs* plaintiffs' delay in providing information they had already given did not cause prejudice sufficient to warrant dismissal (as opposed to a different kind of sanction), especially in view of the public policy favoring resolution on the merits. "It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities." *Foman v. Davis*, 371 U.S. 178, 181 (1962). In *Malone*, *Exxon*, *Adriana* and *Morris*, we approved of the harsh punishment of dismissal because we had "no doubt" about the clearly substantiated, prejudicial effect of the parties' egregious conduct. *See Malone*, 833 F.2d at 131; *In re the EXXON VALDEZ*, 102 F.3d at 433 ("The appellants' *total* failure to respond to discovery and the time consumed by attempting to secure compliance prejudiced appellees.") (emphasis added); *Adriana*, 913 F.2d at 1412 ("Here, the *repeated* failure of Adriana to appear at scheduled depositions compounded by their *continuing* refusal to comply with court-ordered production of documents constitutes an

interference with the rightful decision of the case.") (emphasis added); *Morris*, 942 F.2d at 652 (plaintiffs' two-year failure to move toward disposition on the merits where they unnecessarily delayed, failed to respond to correspondence, failed to appear at meetings and misrepresented intentions prejudiced defendants and obstructed resolution of their claim on the merits). But defendants who must show actual prejudice — as here, where the *McGriggs* plaintiffs proffered a serious excuse — may not make this showing by mere assertion.[19]

Contrary to the dissent's assertion (Dissent at 10366), we cannot in these circumstances summarily rely on a case like *Computer Task Group*, 364 F.3d at 1116, for the proposition that failure to produce discovery required by a court order is not excused because the same information may be available elsewhere. In *Computer Task Group*, a recalcitrant defendant engaged in a "baseless two year fight against each and every discovery request and court order" and did so "willfully and with the intent of preventing meaningful discovery from occurring." 364 F.3d at 1116. In contrast to the *McGriggs* plaintiffs' conduct, there the district court found that the defendant violated five court orders over a seven-month period

> by failing to provide clear answers to interrogatories, giving contradictory responses, making frivolous objections, filing frivolous motions[, ] failing to provide the information [the opposing party] sought[,]

---

[19]We elsewhere, *supra* p. 10324, cite *Fair Housing of Marin*, 285 F.3d at 905, and *In re Virtual Vision*, 124 F.3d at 1143, for the proposition that "[d]isobedient conduct not shown to be outside the litigant's control meets th[e predicate] standard [of fault]." However, not all disobedient conduct is of the same order, and a conclusory assertion of prejudice will not show why the disobedient conduct in *Fair Housing* and *Virtual Vision* is analogous to conduct under review. Although the *McGriggs* plaintiffs' late filings were not outside their control, their behavior is not comparable to the parties' abusive behavior in *Fair Housing* and *Virtual Vision*. *See, e.g., Virtual Vision*, 124 F.3d 1143-44.

> . . . fail[ing] to pay one of the monetary sanctions[,] . . . failing to produce important financial documents and "throwing up a series of baseless smoke screens [that] [took] the form of repeated groundless objections and contradictory excuses," which were "absurd" and "completely unbelievable."

*Id.* at 1115 (quoting the district court). The defendant blamed the loss of documents on an earthquake, a dropped computer and a residential move. *Id.* We agreed that these frivolous excuses "unnecessarily delayed the litigation, burdened the court and prejudiced [the plaintiff]," particularly because "most of the documents [the plaintiff] sought . . . *were never produced*, despite court orders to do so, and most of what [the defendant] did submit came in *two years* after it was requested, and after discovery had already ended." *Id.* at 1116 (emphasis added). This delay "seriously prejudiced [the plaintiff], as key depositions had already been taken." *Id.*

On that egregious record, we upheld the district court's finding that the defendant's "over-all disruptive discovery practice regarding the interrogatories and requests to produce was done willfully and intentionally to stall and prevent [the plaintiff] from conducting meaningful discovery," and that it "ha[d] clogged the Court's docket, protracted th[e] litigation by years, and made it impossible for [the plaintiff] to proceed to any imaginably fair trial." *Id.* Under these circumstances, we held that the "failure to produce documents as ordered . . . is considered sufficient prejudice." *Id.*

The *McGriggs* plaintiffs' conduct is nothing like the defendant's in *Computer Task Group*, nor is it analogous to the conduct of the MDL 1407 plaintiffs whose dismissals we affirm. Even if the *McGriggs* plaintiffs' belated compliance did not generally cure what minimal prejudice defendants suffered, if any, their conduct was not willful or egregious, and they did not refuse to participate in discovery or engage in lengthy delays that "deprived [defendants] of any meaningful

opportunity to follow up on [the] information, or to incorporate it into their litigation strategy." *Payne*, 121 F.3d at 508. Nor did the *McGriggs* plaintiffs confound their own efforts to advance their cases. Rather, they reasonably believed their complaints were in compliance with the intent of the CMOs and that it was therefore unnecessary for them to file a severed complaint or affirmation. To the extent the *McGriggs* plaintiffs were wrong, they rectified their deficiencies within five weeks of the due date of CMO 15. Although we generally recognize that "an involved, complex case increases the prejudice from the delay," *Anderson*, 542 F.2d at 525, we cannot affirm the district court's dismissal because of any prejudice the *McGriggs* plaintiffs' actions caused.

We also reject defendants' argument that if the district court excused the *McGriggs* plaintiffs for their late filing, it would have broadcast a message to all MDL 1407 litigants that CMOs could be disobeyed with impunity. Even were that true, dismissal was not the only sanction that could send the necessary message; lesser punishments tailored to the plaintiffs' violation can be equally effective. We have identified examples:

> a warning, a formal reprimand, placing the case at the bottom of the calendar, a fine, the imposition of costs or attorney fees, the temporary suspension of the culpable counsel from practice before the court, . . . dismissal of the suit unless new counsel is secured[,] . . . preclusion of claims or defenses, or the imposition of fees and costs upon plaintiff's counsel. . . .

*Supra* p. 10316 n.5 (quoting *Malone*, 833 F.2d at 130, 132 n.1 (internal quotation marks and citations omitted). One obvious penalty would have been monetary sanctions imposed on plaintiffs or their counsel in an amount sufficient to "send a message."[20] But we do not know why this or some other sanc-

---

[20]Clients are often several steps removed from the conduct of multidistrict litigation, since even their representatives depend on the performanc

tion would not have worked, because the district court did not address alternatives.[21]

If we endorsed the court's failure to impose lesser sanctions under these circumstances, we would risk making dismissal too attractive (and too available) an option for defendants to pursue and a MDL court to impose. This is all the more true where, as here, the court dismissed the *McGriggs* plaintiffs *sua sponte* instead of in response to a noticed motion. As we note elsewhere, *supra* p. 10316, such an action requires us to focus more closely on the lack of warning and the failure to consider less drastic alternatives. *See Oliva*, 958 F.2d at 274. But when a party's conduct is not egregious or when a party receives insufficient warning, the failure to consider any alternatives at all limits the deference we give a MDL court. Plaintiffs should not be casualties of a court's readiness to skip to the most drastic sanction to deter other, more culpable plaintiffs.

**[22]** In sum, although we grant additional deference to a district court administering a MDL proceeding, due process and fundamental fairness may not be sacrificed to provide assembly-line justice. The *McGriggs* plaintiffs "retain[ed] their individual identities," *In re Career Academy Antitrust Litig.*, 57 F.R.D. 569, 570 (E.D. Wisc. 1972), when they were

of proxies such as Lead and Liaison Counsel and Plaintiffs' Steering Committees. Where attorney sanctions are practicable, they may serve the heightened logistical needs of multidistrict litigation without overshadowing the interests of the parties represented.

[21]The dissent suggests that we err in reversing dismissal of the *McGriggs* plaintiffs and *Sasseen*, No. 04-35884, *infra* p. 10364, because if every MDL plaintiff ignored a CMO simply because he thought it superfluous, "the very purpose of the MDL . . . would be subverted." (Dissent at 10367.) As we explain above, we do not condone the noncompliance of the *McGriggs* plaintiffs or Sasseen. We hold only that *dismissal* — as opposed to another, more appropriate sanction — is not warranted under the circumstances they present.

involuntarily transferred to MDL 1407, and their arrival in the litigation did not "change the[ir] rights [as] parties." *In re Equity Funding Corp. of America Sec. Litig.*, 416 F.Supp. 161, 176 (C.D.Cal. 1976) (quoting *Johnson v. Manhattan R.R.*, 289 U.S. 479, 496-97 (1933)). Because the district court failed to provide the *McGriggs* plaintiffs the individualized consideration to which they were entitled, we reverse its dismissal and remand for further proceedings.

X

*Sasseen*[22]

Donna Sasseen appeals dismissal of her action with prejudice for failure to file an Affirmation setting forth the PPA products that she ingested and the alleged manufacturers or distributors of such products, as required by CMO 13.

Sasseen's complaint, transferred to MDL 1407 on November 12, 2003, named multiple defendants and thus was subject to CMO 13, issued on May 2, 2003, and CMO 13A, issued on June 21, 2003, requiring plaintiffs in multi-defendant cases to file an Affirmation within thirty days of the order or the date their case was docketed in the MDL listing the products allegedly ingested and the manufacturers of those products. Both provide that "if the Affirmation fails to disclose the ingestion by [the] plaintiff of a PPA-containing product manufactured and/or distributed by a named defendant, then such defendant is authorized to submit to the Court the name of the plaintiff who alleges use of a PPA product, requesting dismissal of that defendant with prejudice with regard to claims brought by the named plaintiff." Each also states that defendants may seek "additional remedies or sanctions against any plaintiff with regard to discovery obligations set out in this CMO, prior CMOs and/or identification of defendants' products in a Plaintiff Fact Sheet." CMO 13A simplified the

---

[22]*Sasseen* is before Judges Leavy, Rymer, and Fisher.

paperwork required to be filed with proposed dismissals, but did not change the Affirmation requirement itself.

Sasseen's Affirmation was due on December 15, 2003, which she concedes is a deadline she did not meet. On February 3, 2004, Defendants' Liaison Counsel filed a motion to dismiss eleven cases, of which Sasseen's was one, pursuant to Rule 37(b)(2)(C) and Rule 41(b). Sasseen's February 9, 2004 response included an untimely Affirmation, which listed the same products and defendants set forth in her complaint.

The district court dismissed for reasons stated in the motion to dismiss. These included that CMOs 13 and 13A established a procedure whereby a defendant not named in an Affirmation or the Plaintiff's Fact Sheet could move to be dismissed with prejudice from that individual plaintiff's case; however, failure to file any Affirmation prevented defendants from taking advantage of this procedure, thus causing them to spend unnecessary resources conducting discovery in cases in which their product may not be at issue. Also, failure to file Affirmations warranted dismissal under the *Malone* factors because: (1) The defendants' inability to move to be dismissed unnecessarily prolonged their involvement in this litigation, and the public interest in expeditious resolution of litigation is not served by plaintiffs who fail to file court-ordered Affirmations designed to narrow the field of potentially culpable defendants and to clarify the issues for trial. (2) Failure to conduct discovery impeded the court's ability to manage its docket, as it does not reflect the true parties to each individual action. (3) Defendants who had no liability exposure were being forced to expend unnecessary resources to participate in cases in which they were not true parties, and could not make use of the court-sanctioned method of seeking dismissal upon receipt of an Affirmation. Further, plaintiffs had control over who the parties to their actions would be, as well as exclusive knowledge of what products they allegedly ingested. (4) Although public policy favors trying cases on their merits, it also favors the principle that litigants should be ready to prosecute claims

when brought, and should not bring suit against a party who is not liable for their alleged injuries. (5) A less drastic sanction was available to these plaintiffs. If they had filed Affirmations, defendants could have utilized the court-sanctioned method of dismissing individual defendants pursuant to CMOs 13 and 13A instead of seeking to dismiss these cases in their entirety.

**[23]** Sasseen argues that she complied with the intent of CMO 13 to give proper notice to the defendants because her complaint pled with specificity the products she ingested and the defendants who manufactured them. As *Sasseen* is basically in the same posture as *McGriggs*, it is controlled by it and accordingly, we reverse.

XI

*Conclusion*

MDL 1407 is quite a complicated proceeding, involving hundreds of actions and thousands of individual claims against many defendants. In consultation with Lead and Liaison Counsel and steering committees, the district court crafted case management orders to "uncomplicate" the multidistrict proceedings. Congress contemplated that an MDL court should do this to secure the "just and efficient conduct" of actions coordinated for pretrial purposes under 28 U.S.C. § 1407(a).

The orders themselves are not at issue; they were not objected to, relief from them was not sought, and they are not challenged on appeal. They sought to move individual cases forward by simplifying the discovery process (CMOs 6, 10, and 19), and by severing multiple-plaintiff claims and claims by plaintiffs against multiple defendants into manageable actions against true defendants (CMOs 13 and 15).

Many plaintiffs, some of whom pursue the appeals that are before us, chose not to comply. All had a chance to explain

why not, and the district court found the explanations wanting.

Failure to comply with case management orders in MDL proceedings such as MDL 1407, where both sides agree that the orders serve the important interest of moving the cases along, adversely affects the public interest, as well as the parties' private interest, in expeditious resolution of litigation. A district court cannot manage its docket if such orders are not respected. This harms plaintiffs with meritorious claims whose progress toward resolution is bogged down by others who will neither put up nor shut up; defendants who do not know against whom or what they are defending and so can neither conduct case-specific discovery, seek an early exit by summary adjudication, nor assess the potential value of the plaintiffs' claims for settlement; and the public, whose access to the courts is impeded when judicial resources are diverted from the proper administration of justice to dealing with recalcitrant parties.

In these cases both the orders and the court's expectations were clear. The court was responsive to proper requests for relief, and, with the exception of the *McGriggs* plaintiffs and *Sasseen*, excused defaults that were non-consequential. However, the court needed to enforce its orders in cases that were stalled by noncompliance so that the coordinated cases for which it was responsible could be resolved on the merits by motion, settlement, or remand for trial.

Accordingly, we conclude that while the factors which guide a court's discretion in ordinary cases on an ordinary docket also inform an MDL court's decision to invoke dismissal as a sanction for failure to comply with its orders, the court's discretion is necessarily informed, and broadened, by the number of actions, their complexity, and its charge in the multidistrict context to promote the just and efficient conduct of actions that are coordinated or consolidated for pretrial purposes. The district court acted within its discretion in deciding

that dismissal of the cases before us, except for *McGriggs* and *Sasseen*, was warranted. We therefore uphold its judgment in *Allen, Anderson, Alford, Clinton, Page, Riley, Holmes, McDaniel, Samuels, Ackel,* and *Arrington.* We reverse as to *McGriggs* and *Sasseen.*

AFFIRMED IN PART AND REVERSED IN PART.

---

RYMER, Circuit Judge, dissenting as to *McGriggs* and concurring as to *Sasseen*, with whom LEAVY, Circuit Judge, joins, concurring as to *Sasseen*:

I would also affirm in *McGriggs*, for the same reasons we affirm in *Ackel* and *Arrington*. I am constrained to concur in *Sasseen* as it is materially indistinguishable from *McGriggs*. However, I disagree that either case should be resolved as the majority resolves *McGriggs*. In a nutshell, failure to make discovery required by a court order is not excused by the fact that the same information may be available elsewhere. *See, e.g.*, *Computer Task Group, Inc. v. Brotby*, 364 F.3d 1112, 1117 (9th Cir. 2004). Honoring this rule is particularly important in the context of a multidistrict litigation proceeding such as MDL 1407, where hundreds of cases asserted claims based on ingestion of more than one PPA-containing product, and indiscriminately listed numerous manufacturers as defendants. CMO 13 was crafted to, and did, provide a sensible process for sorting this out. Even though some individual complaints may already have done so, many did not. The case management orders necessarily applied to *all* cases in which more than one product and more than one manufacturer were named. Sasseen, for example, sought no relief from this obligation. Indeed, it could not have been simpler for her to comply because all that was required was that she identify the manufacturer and the product — something she says she knew, and in fact had already done.

While the sanction of dismissal probably would not have been imposed were either *McGriggs* or *Sasseen* an individual case on an ordinary docket, the need for an order such as CMO 13 would not have arisen, either. Deciphering which complaints properly matched up products and defendants would entail reading tens of thousands of pieces of paper. I believe that Judge Rothstein properly "uncomplicated" the process by the device of requiring plaintiffs in multi-defendant cases to file a single piece of paper with all the necessary information. Rather than complying, Sasseen decided for herself to ignore the order. If all MDL plaintiffs were to do likewise, the very purpose of the MDL — to conduct transferred actions in a "just and efficient" way — would be subverted.

Therefore, I would affirm across the board.